09-1771-cr
USA v. Torres

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued:  February 18, 2010                    Decided:  May 5, 2010)

Docket No. 09-1771-cr

_____

UNITED STATES OF AMERICA,

                                   Appellee,

                        - v. -

JOSE TORRES,

                                   Defendant-Appellant.

_____

Before:  KEARSE and HALL, Circuit Judges, RAKOFF, District Judge[*].

         Appeal from a judgment of the United States District Court for the Southern District of New York, Paul G. Gardephe, Judge, convicting defendant of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.

         Reversed.

                   NICHOLAS L. McQUAID, Assistant United States
                        Attorney, New York, New York (Preet
                        Bharara, United States Attorney for the
                        Southern District of New York, Michael D.
                        Maimin, Assistant United States Attorney,

_____

[*]  Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

New York, New York, on the brief), <u>for</u> <u>Appellee</u>.

EDWARD S. ZAS, New York, New York (Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, on the brief), <u>for Defendant-Appellant</u>.

KEARSE, <u>Circuit Judge</u>:

Defendant Jose Torres appeals from a final judgment entered in the United States District Court for the Southern District of New York following a jury trial before Paul G. Gardephe, <u>Judge</u>, convicting him of conspiring to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and sentencing him principally to 78 months' imprisonment. On appeal, Torres contends that the evidence at trial was insufficient to prove beyond a reasonable doubt that he acted knowingly and with the specific intent to further a conspiracy for the distribution of narcotics. Finding merit in his contention, we reversed the judgment of conviction and remanded for entry of a judgment of acquittal in an order filed on May 4, 2010, indicating that this opinion would follow.

I. BACKGROUND

The government's evidence at trial consisted principally of 10 one-kilogram bags containing cocaine and the testimony of law enforcement agents and employees of United Parcel Service ("UPS") with respect to the efforts of Torres on April 30, 2008,

to take delivery of the boxes in which the cocaine had been shipped. The evidence, taken in the light most favorable to the government, showed the following.

A. Events on the Morning of April 30

On April 30, 2008, UPS deliveryman Francisco Bautista had in his truck three items to be delivered to 124 Locust Hill Avenue in Yonkers, New York ("124 Locust Hill"), a multi-residence house. One was a next-day air envelope for "Apartment 3." The other two were bulky packages (the "Packages") weighing 72 and 62 pounds, respectively, each designated "high value" by the shipper in Puerto Rico, and each bearing an address label reading as follows:

```
JOSE TORREZ
(347) 712-4066
FLOOR # 1
124 LOCUST HILL AVE
YONKERS NY 10701
UNITED STATES
```

(Government Exhibits ("GX") 1, 2).

Bautista testified that he went to 124 Locust Hill at approximately 9:45 a.m. that morning. When he arrived, he was approached by two Hispanic men, one of whom asked whether Bautista had a package for "Jose or something." (Trial Transcript ("Tr.") 239.) When Bautista responded affirmatively, the man stated that the Packages were for him. As the Packages were designated "high value," Bautista requested identification. When the man produced a New York State Identification Card ("ID Card") on which, Bautista noted, the name matched but the address didn't" (id.), in that the ID Card showed an address in Brooklyn rather than Yonkers

(see id. at 239-40), Bautista said he could not release the Packages to the man because "the address doesn't match" (id. at 240). The man tried to convince Bautista to release the Packages by saying that he was moving and had not yet changed his ID Card; Bautista was unpersuaded.

Bautista proceeded to deliver the next-day air envelope for Apartment 3 to the building's superintendent. Bautista inquired about the two men who had approached him and who remained alongside the building; the superintendent said he did not know them. (See id. at 240-41.)

Bautista departed. When he reached his next destination less than a minute away, and was exiting his truck, the two men he had encountered at 124 Locust Hill approached him again, asking about the Packages. Bautista said he would call his supervisor and if he were given authorization to release the Packages despite the ID discrepancy, he would return to 124 Locust Hill to deliver them. (See Tr. 242.) After entering the building at this location, Bautista telephoned his supervisor, who told him not to release the Packages and said that a loss-prevention security agent (the "LP") would be sent to meet him. When Bautista emerged from the building, the two men were still there and again urged him to release the Packages; they also asked Bautista to speak on their telephone to a "cousin" who had sent the Packages. Bautista told them he could not do anything without authorization from his supervisor. (See id. at 243-44.)

- 4 -

About a half-hour later, the LP met Bautista and they returned to the vicinity of 124 Locust Hill; Bautista parked some 5-10 feet from the building, and the LP parked behind him. When they arrived there, four men emerged from behind the building and stared at Bautista and the LP. (See id. at 246-47.) After the LP made a quick telephone call, he and Bautista promptly departed. Bautista turned the Packages over to the LP. (See id.)

The LP took the Packages to a UPS facility in Mount Vernon, New York, where they were opened in a secure, limited-access room by Alex Gamboa, a UPS security specialist. (See, e.g., Tr. 257, 259-61.) The Packages contained kitchen cabinets--introduced into evidence at trial--each of which had a secret compartment: one on the back, the other at the bottom (see, e.g., id. at 53-54, 263-64, 269-70). Inside each cabinet's secret compartment, Gamboa found five brick-shaped objects wrapped in black bags; inside those bags were white bags containing white material. (See id. at 263-64, 266-70.) The compartments also contained newspaper, sprayed foam insulation, and other material to prevent the bags from moving around, shaking, or breaking apart. (See, e.g., id. at 53-54.) Gamboa telephoned Detective Mark Carey of the Westchester County Police Narcotics Unit, who arrived shortly and took custody of the Packages. (See id. at 271.)

The bags secreted in the Packages were later determined to contain cocaine. The bags' total weight was approximately 10

kilograms. The cocaine had a street value of between $750,000 and $1 million. (See, e.g., id. at 49, 77.)

B. The Controlled Delivery in the Afternoon of April 30

Westchester police officers rewrapped the Packages and, working with the Yonkers police, arranged for a "controlled delivery" to take place at a UPS store in a Yonkers strip mall. (See Tr. 56-62.) Some 15 law enforcement agents participated. Coordinating with the store manager--identified at trial only as "Stan"--Detective Carey, dressed in plainclothes, was stationed in the UPS store behind a wall of mailboxes; Westchester County Police Officer Isai Moreira was in the UPS store dressed as a UPS employee. (See, e.g., id. at 111-12, 57-60). Other law enforcement agents were deployed in various vehicles in the mall parking lot. (See, e.g., id. at 204-08.)

At approximately 3:55 p.m., Detective Carey called (347) 712-4066, the number provided for the addressee on the Packages' labels, and asked the man who answered whether he was Jose Torrez. When the man said he was, Carey identified himself as a UPS employee and said the Packages could either be picked up at the Yonkers UPS store that day or be delivered the next day. The man, in "broken English," expressed frustration at UPS's failure to deliver the Packages earlier that day, stating that he had just moved to Yonkers and that was why the address on his ID Card did not match the address on the Packages; he said he would

come to the UPS store to pick up the Packages. (See id. at 60-62.)

An hour later, Torres arrived in a green minivan driven by another man and entered the UPS store. (See Tr. 69, 205-06.) Torres said "'I'm here to pick up the boxes for Jose Torres,'" and Stan asked to see his identification. (Id. at 184.) Torres handed Stan a New York State ID Card bearing the name "Torres, Jose, A" and a Brooklyn address (GX 30; see Tr. 72) and stated that he was upset at UPS's earlier refusal to deliver, explaining in "broken English" that he had moved and had not had time to change the address on his identification (Tr. 169). Stan photocopied the ID Card, showed the copy (GX 30) to Moreira--the undercover officer dressed as a UPS employee--and returned the ID Card to Torres. Torres promptly started to load one of the Packages onto a nearby hand truck and took it out to the curb; Stan asked Moreira to assist Torres, and Moreira tried to assist with the second Package, but Torres "shooed [him] away" and took the second Package to the curb as well. (Tr. 70, 170-72.)

In the meantime, unbeknownst to Torres, the driver of the green minivan, after Torres entered the UPS store, had peered through the windshield of a police surveillance van that was parked curbside just north of the UPS store and, with "a startled look on his face . . . [had] quickly pulled away" (id. at 206) and left the parking lot (see id. at 210-11). (One of the other surveillance vehicles followed the minivan only to the end of the parking lot; the surveillance team leader "told [the team] to

- 7 -

stand by and stay where we were, to let the van Gogh [sic]" (id. at 211).)

When Torres had both Packages at the curb, Moreira, who had accompanied him out of the store with the second Package, asked him where his vehicle was; Torres said he had a ride. Torres peered all around for the minivan and searched the nearby aisles of the parking lot; he spent some 10 to 15 minutes looking around and exploring deeper and deeper into the lot, but returning frequently to the Packages at the curb. (See, e.g., Tr. 172-74, 191.) Moreira, part of whose surveillance assignment was to keep an eye on the cocaine (see, e.g., id. at 186), remained at the curb with the Packages (see, e.g., id. at 172, 173, 176). Torres, conversing with Moreira in Spanish (see, e.g., id. at 197), told Moreira that the driver had needed to use a bathroom and perhaps had gone into a nearby McDonald's (see id. at 172, 194). Torres did not look for the driver in any stores, however; he explored only the parking lot. (See, e.g., id. at 194, 201-02.)

Moreira eventually asked whether Torres had a cell phone number for the driver, and when Torres said he did not, Moreira suggested that Torres call a taxi. Torres, after looking around once more, reentered the UPS store to call a cab. (See Tr. 176-77.) As Torres entered, Detective Carey exited because he "didn't want to make [Torres] any more suspicious or nervous than he already appeared" (id. at 74); Torres then used the store's telephone while repeatedly "looking over his shoulder at [Carey]"

(id. at 74-75).  Carey, mindful that the store had a rear exit (see id. at 75), reentered the store after some 2-3 minutes (see, e.g., id. at 177); he identified himself as a police officer; and he and another officer escorted Torres out of the store and placed him under arrest (see id. at 75-76, 177).

While the officers awaited a transport vehicle, with Torres in custody, Torres attempted to speak to them in his broken English, and Carey summoned Moreira.  (See Tr. 177-78.) Moreira, while walking over to them, took out his police shield and held it out in front of him to identify himself as a police officer (see id. at 198), and Torres immediately started talking to him in Spanish (see id. at 178).  Torres said that this is what happens when you do favors for somebody, and that a man in a Yonkers bodega had paid him to pick up the Packages.  (See id. at 231.)  Later that day, when Moreira was taking pedigree information from Torres, Torres said he worked at the bodega, cleaning up, and that he was homeless.  (See id. at 231-32.)

C.  The Present Prosecution

In a two-count superseding indictment, Torres was charged with knowingly and intentionally possessing five kilograms and more of substances containing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Two), and conspiring to do so, in violation of 21 U.S.C. § 846 (Count One).  No other persons were apprehended or charged.

At Torres's trial, in addition to the evidence described in Parts I.A. and I.B. above, the government introduced records of several telephone calls. A UPS record, indicating that the UPS call center in Yonkers had received a call at 11:43 a.m. on April 30, reads in part as follows:

```
Caller:
     GADREL PADILLA - NON-PREFERRED

     FL# 1 124 LOCUST HILL AVE
     YONKERS, NY 10701
     (347) 712-4066
```

(GX 302.) The record shows the tracking number for one of the Packages and the hour at which the driver had departed UPS with the Packages, and states as follows (with our bracketed assumed completions of words partially lopped off in the reproduction of the UPS record (see id.)):

```
CUST STATES THAT DRIVER WOULD NOT L[ET] HIM ACCEPT
THE PKG WHEN HE CAME HE JUST MOVED IN AND HE HASNT
CHANGE HIS ADD YET BUT PKG I[S] ADD TO THIS PERSON
AND DRIVER STILL NEVER LET HIM TAKE IT
```

(id.). Gamboa explained that "CUST" meant customer, "PKG" meant package, and "ADD" meant address. (See Tr. 291.)

The government also introduced telephone company records for the (347) 712-4066 number (see GX 300), which was registered to an "Antonio Gonzales" (see GX 300A, ¶ 2). The records showed all telephone calls and "Direct Connect" activity between (347) 712-4066 and various numbers from March 17 to May 22, 2008. For April 26-29, the records showed dozens of calls between the (347) 712-4066 number and (787) 300-1872 (see GX 300); 787 is an area code for Puerto Rico (see GX 300A, ¶ 6). The records also

- 10 -

showed six calls to (347) 712-4066 from other numbers in Puerto Rico between 2:30 p.m. and 3:18 p.m. on April 30, the day of the failed delivery, as well as Direct Connect activity after Torres arrived at the UPS store. (See GX 300.)

At the close of the government's evidence, Torres moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. The district judge reserved decision. Torres rested without presenting evidence.

The jury found Torres guilty on the conspiracy count, Count One. The jury had been instructed that "[i]f, and only if" it found Torres guilty on Count One (Verdict Form at 2 (emphasis in original)), it was to answer the following question "relat[ing] to quantity" (Tr. 459; see id. at 439): "Did the defendant either have personal involvement with, or was it reasonably foreseeable to him that the conspiracy involved, and was it within the scope of his agreement to distribute or possess with intent to distribute, five kilograms or more of a mixture or substance containing a detectable amount of cocaine" (Verdict Form at 2 (emphases in original); see also Tr. 459, 472), the jury answered that question "No" (Tr. 472). The jury found Torres not guilty on the possession count, Count Two.

At sentencing, the district court denied Torres's Rule 29 motion. After finding by a preponderance of the evidence that, inter alia, Torres was "directly and personally involved with the ten kilograms of cocaine" (Sentencing Transcript at 7), the court sentenced Torres principally to 78 months' imprisonment.

- 11 -

II.  DISCUSSION

On appeal, Torres contends that the trial evidence was insufficient to permit the jury to find beyond a reasonable doubt that he had knowledge that the purpose of the conspiracy of which he was found to be a member was the distribution of narcotics.  We agree.

A.   Elements of Conspiracy

The essence of conspiracy is agreement.  In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent.  See, e.g., United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) ("Huezo"), cert. denied, 130 S. Ct. 142 (2009); United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004) ("Jones"); United States v. Rodriquez, 392 F.3d 539, 545 (2d Cir. 2004) ("Rodriquez"); United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004) ("Morgan"); United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002) ("Friedman"), cert. denied, 538 U.S. 981 (2003).  Although "[t]he government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent,'" Huezo, 546 F.3d at 180 (quoting United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir.), cert. denied, 513 U.S. 879 (1994)), the government "must prove at

least the degree of criminal intent necessary for the substantive offense itself," United States v. Feola, 420 U.S. 671, 686 (1975). "[T]he knowledge of the parties is relevant" to a conspiracy charge "to the same extent as it may be for conviction of the substantive offense." Id. at 695.

Title 21 of the United States Code provides, inter alia, that it is "unlawful for any person knowingly or intentionally" to "distribute" or to "possess with intent to . . . distribute . . . a controlled substance," 21 U.S.C. § 841(a)(1) (emphasis added), or to "conspire[] to commit" such an offense, id. § 846. To prove intent, of course, the government must show knowledge, for "knowledge is the foundation of intent," Direct Sales Co. v. United States, 319 U.S. 703, 711-12 (1943). Thus, since the government cannot establish the substantive § 841(a)(1) offenses of distribution or possession with intent to distribute without proving that the defendant knew he was dealing with a controlled substance, it likewise cannot establish a § 846 conspiracy to distribute or to possess with intent to distribute without proving, inter alia, that the defendant knew that the conspiracy involved a controlled substance. See, e.g., Rodriguez, 392 F.3d at 545 ("the conspiracy and substantive charges, both of which are specific intent crimes, required the government to establish that Rodriguez knowingly and intentionally participated in the drug deal"); United States v. Lorenzo, 534 F.3d 153, 159-62 (2d Cir. 2008) ("Lorenzo"); cf. Friedman, 300 F.3d at 115, 124-26 (a charge of conspiracy to commit extortion in violation of 18 U.S.C.

- 13 -

§ 894(a)(1) "require[s] the Government to prove, beyond a reasonable doubt, that the defendant knew [that] the specific nature of the conspiracy" included extortion); United States v. Samaria, 239 F.3d 228, 233-34, 236 (2d Cir. 2001) ("Samaria") (a charge of conspiracy to receive and possess stolen goods in violation of 18 U.S.C. § 2315 requires the government to prove that the defendant knew the goods were stolen), abrogated on other grounds by Huezo, 546 F.3d at 180 n.2. Proof that the defendant engaged in suspicious behavior, without proof that he had knowledge that his conduct involved narcotics, is not enough to support his conviction for conspiracy to traffic in narcotics. See, e.g., Lorenzo, 534 F.3d at 160-62. "'"Proof that the defendant knew that some crime would be committed is not enough."'" Rodriguez, 392 F.3d at 545 (quoting Morgan, 385 F.3d at 206 (quoting Friedman, 300 F.3d at 124) (emphasis in Friedman)).

"'[B]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence.'" Huezo, 546 F.3d at 180 (quoting United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007)); see, e.g., Friedman, 300 F.3d at 124; cf. Morgan, 385 F.3d at 205-06 (properly instructed jury is entitled to infer the requisite knowledge on the basis of evidence that the defendant consciously avoided learning the nature of the conspiracy). "Nevertheless, where the Government seeks to prove a fact that is also an element of the

offense by circumstantial evidence, [w]e must . . . be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." Friedman, 300 F.3d at 124 (internal quotation marks omitted); see, e.g., Rodriquez, 392 F.3d at 544.

B. Our Standard of Review

For a defendant who challenges the sufficiency of the evidence to support his conviction, our standard of review poses high obstacles. In reviewing such a challenge we "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008) ("Chavez"). We defer "to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998); see, e.g., Samaria, 239 F.3d at 233. The government's proof "need not eliminate every possible theory of innocence," United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993); and in assessing whether the government has met its burden, we view pieces of evidence "not in isolation but in conjunction," United States v. Maldonado-Rivera, 922 F.2d 934, 978 (2d Cir. 1990), cert. denied, 501 U.S. 1233 (1991). "The conviction must be upheld if 'any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'" Chavez, 549 F.3d at 124 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in Jackson)); see, e.g., Samaria, 239 F.3d at 233.

These principles apply whether the evidence being reviewed is direct or circumstantial. See Glasser v. United States, 315 U.S. 60, 80 (1942). Where direct evidence is absent, however, "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime." Samaria, 239 F.3d at 235. And while we defer to a jury's assessments with respect to credibility and conflicting testimony, and to its choice between the competing inferences that can be drawn from the evidence, the jury's inferences must be "reasonably based on evidence presented at trial," not on speculation, United States v. Ceballos, 340 F.3d 115, 125 (2d Cir. 2003) (internal quotation marks omitted); "'specious inferences are not indulged,'" Lorenzo, 534 F.3d at 159 (quoting Jones, 393 F.3d at 111).

In Lorenzo, for example, while mindful that conspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence, see 534 F.3d at 161, we found the evidence of knowledge on the part of Julio Lorenzo insufficient to sustain his convictions for conspiracy to import and conspiracy to distribute narcotics, given the absence of evidence as to what was said in any of the conversations in which he participated and the lack of evidence that he knew the contents

of a suitcase a conspirator was carrying. Thus, "although there [wa]s ample evidence demonstrating the existence of the conspiracy, and that Julio was present at and participated in events that furthered the conspiracy, there [wa]s insufficient evidence to show that he did so knowingly and with the specific intent to further a cocaine smuggling and distribution conspiracy." Id. at 160. We noted that the fact that Julio Lorenzo transferred $14,000 to one of the conspirators was

> suspicious and, viewed in the light most favorable to the government, indicative of participation in illegal behavior. But such a transfer is consistent with participation in a wide variety of offenses, and in light of the other evidence, [wa]s insufficient to prove Julio's intent to participate in the conspiracy charged in the indictment.

Id.

In Friedman, we reversed the conviction of the defendant Rodriguez, who furnished others with guns, for conspiracy to commit extortion. Evidence of, inter alia, a lengthy telephone call between the homes of a conspirator and Rodriguez did not provide any basis for inferring that Rodriguez knew that there was a conspiracy to use the guns to commit extortion, given that there was no evidence as to the content of the telephone conversation. We pointed out that evidence showing merely that a defendant associated with conspirators "under suspicious circumstances," and that he "suspected (or should have suspected) that [a crime] might occur," is not sufficient to show specific knowledge of the purposes of the underlying conspiracy. 300 F.3d at 126 (internal quotation marks omitted).

- 17 -

"[C]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime," such as "proof of a defendant's knowledge or intent through evidence that the defendant participated in conversations directly related to the substance of the conspiracy," "possess[ion of] or mention[] in documents important to the conspiracy," "proof that a defendant exercised authority within the conspiracy itself," "recei[pt of] a share of the profits from the conspiracy," or a defendant's statements "explicitly confirm[ing] the nature of the activity in which the co-conspirators were engaged."

Id. (quoting Samaria, 239 F.3d at 235-36).

In Rodriguez, we noted that the evidence was ample to show that the defendant had served coconspirators as a lookout; but we overturned his narcotics conspiracy conviction because there was no evidence that he knew the transaction for which he was serving as a lookout was one involving drugs. See 392 F.3d at 545-48. The fact that the defendant may have sat beside a package containing narcotics was, in the circumstances, not probative:

[T]he government would have us conclude that the heroin was in plain view or could somehow be identified if one were sitting next to it, such that Rodriguez would have been aware of the nature of the transaction. We cannot so hold. . . . [T]he heroin was hidden inside a telephone box and also wrapped in two bags. . . . Accordingly, even were we to assume that Rodriguez sat near the heroin, this fact may not serve as circumstantial evidence adequate to prove Rodriguez's knowledge and intent.

Id. at 547 (emphases added).

We reached a similar conclusion in Samaria, which involved conspiracy convictions--for conspiracy to receive or possess stolen goods and conspiracy to commit credit card fraud--of the defendant Eliaho, a gypsy cab driver whose passengers, Glover and

- 18 -

Samaria, loaded into his cab boxes of merchandise that had been purchased with stolen credit information. We reversed Elaiho's convictions because the government's evidence was "insufficient to prove that Elaiho knew that the boxes in question contained stolen goods, or further that he knew these goods had been stolen by means of credit card fraud." 239 F.3d at 236. Despite Elaiho's presence in the car with boxes containing the goods, "the exterior appearance of the boxes was equally consistent with any number of different criminal offenses including the receipt and possession of drugs, illegal weapons, counterfeit currency, or the receipt of legal goods such as drug paraphernalia that would later be employed in a criminal endeavor." Id. at 237. Further, the requisite proof of knowledge was not supplied by evidence that Elaiho was present on both occasions when law enforcement officers observed conspirators picking up purloined merchandise and that Elaiho rode in the passenger seat of his car on one such occasion. We stated that

> [t]hese facts may help establish that Elaiho had a closer association with Glover and Samaria than that of a taxi driver, and may, in conjunction with the evidence of Elaiho's false exculpatory statements, observation of the goods, and service as a "lookout," support an inference that Elaiho knew that Glover and Samaria were engaged in some sort of criminal enterprise. Together, this evidence offers us no indicia, however, that Elaiho was aware of the specific crimes charged and that Elaiho had the specific intent to participate in those crimes.

Id. at 238 (emphasis added).

- 19 -

## C. The Record in the Present Case

The evidence in the present case, taken in the light most favorable to the government, was sufficient to permit the jury to find one element of the conspiracy offense beyond a reasonable doubt, i.e., that there existed a conspiracy for the distribution of cocaine. Such an inference could be drawn from the facts that, inter alia, 10 kilograms of cocaine were secreted in a shipment sent from Puerto Rico to New York; that the shipment was immediately preceded by dozens of calls between Puerto Rico and (347) 712-4066, the telephone number that the shipper listed for the Packages' addressee, plainly allowing the inference that more than one person was involved with the shipment; that the telephone contact number given for Torres, as the addressee of the Packages, was registered to a person named Gonzales, was used to call UPS by a person calling himself Padilla, and was used that day by others after Torres went to the UPS store and was arrested; and that when Bautista and the LP went to 124 Locust Hill after Bautista had refused to release the Packages, there were four men who emerged from behind the house to evince strong interest in the UPS truck. Plainly, the evidence was sufficient to establish the existence of a joint enterprise whose purpose was the distribution of cocaine.

Further, the evidence in the present case--again viewed in the light most favorable to the government--showed plainly that Torres had a connection with the Packages containing the cocaine. Notwithstanding the spelling of Torres with a "z" on the Packages' shipping labels, the Packages plainly were sent to Torres: On the

day they were due to be delivered at 124 Locust Hill, he was at that location attempting to take possession of them. On the street in front of that address, Torres attempted to convince Bautista to release the Packages to him; when that failed, Torres followed Bautista to Bautista's next destination to try to persuade him to release the Packages; and Torres went to the UPS store to pick up the Packages. Plainly, Torres made assiduous attempts to collect the Packages.

The evidence as to Torres's statements and conduct was likewise sufficient to permit an inference that Torres was most likely aware that the Packages contained contraband of some kind. Although he said in his postarrest statement that a man in a Yonkers bodega had paid him to pick up the Packages, the Packages were addressed to Torres. Torres gave a specious explanation for the discrepancy between the 124 Locust Hill address to which the Packages were shipped and the Brooklyn address on his New York State ID Card, stating that he had moved but had not gotten his ID Card updated--an explanation that was implausible in light of the fact that the superintendent at 124 Locust Hill did not know him, and was false, assuming the truth of Torres's postarrest statement that he was homeless. Further, Torres's attempt to gain possession of the Packages on the street was suspicious in part because common sense suggests that a person expecting heavy boxes would want them delivered to his apartment door. Torres's conduct at the UPS store could also be viewed as suspicious. He "shooed away" an offer to help him move the heavy Packages out to be

loaded into his vehicle. After not being able to locate the minivan in which he had arrived, Torres told Moreira that the driver had needed to use a restroom and might have gone into McDonald's; but Torres never looked for the driver in McDonald's, or in any other store. When he finally decided to call a taxi, Torres appeared nervous and suspicious and kept looking over his shoulder toward the plainclothes detective, Carey. This evidence--especially the facts that Torres undertook to receive heavy and bulky packages on the street, which were addressed to him at a building with which he had no apparent connection-- permitted an inference that Torres would have known or suspected that he was participating in something illicit.

What we do not see in the record, however, is any evidence that Torres knew the Packages contained narcotics. There was, for example, no cooperating witness testifying at trial. There was no evidence of any drug records implicating him. The cocaine was well concealed and not visible. There was no proof of any narcotics-related conversation to which Torres was a party.

The government characterizes (347) 712-4066--the contact number provided for Torres on the Packages' shipping labels--as "The Torrez Phone" and argues that "Torres had repeated contact with the Puerto Rican shippers of the cocaine" (Government brief on appeal at 27-28; see id. at 21-22). That characterization and argument, however, are not sufficiently supported by evidence. The telephone company records introduced by the government showed that that telephone number was registered to an Antonio Gonzales,

- 22 -

not to Torres. Further, those records showed that that telephone was used by a person or persons other than Torres on the afternoon of April 30, for they showed activity for that number after Torres was in custody. Indeed, it appears that the only credible evidence as to the use of that telephone by Torres himself at any time was the evidence that Torres answered the second call made by Carey to that number on April 30. Although the government suggests that Torres had also used that phone to call UPS that morning after Bautista refused to release the Packages, the UPS record of that call (quoted in Part I.C. above) shows that the caller identified himself as Gadrel Padilla. It seems highly implausible--and contrary to common sense to infer--that that call was in fact made by Torres, as that would mean he was attempting to gain possession of the Packages by identifying himself as someone other than the person to whom the Packages were addressed. And as to the numerous contacts between the (347) 712-4066 telephone number and various numbers in Puerto Rico, the government presented no evidence as to the identity or conduct of Antonio Gonzales and no evidence that Torres was a party to any of those calls to or from Gonzales's telephone. Without such evidence, no rational juror could find that--on a telephone proven to belong to Gonzales and to have been used by persons other than Torres--the "repeated contact[s] with the Puerto Rican shippers of the cocaine" (Government brief on appeal at 27-28) were made by Torres. Thus, the telephone records did not provide a basis for a

finding beyond a reasonable doubt that Torres had knowledge that the Packages contained narcotics.

Finally, the government argues, relying on our decision in Huezo, that it should be inferred that Torres had the requisite knowledge of the nature and scope of the conspiracy because otherwise the conspirators would not have reposed trust in him to receive a shipment of cocaine that could be sold on the street for $1 million. The analogy to Huezo is inapt.

In Huezo, which involved a conspiracy to launder $1 million in drug proceeds, we indeed found it permissible for the jury to infer that Huezo knew that he was participating in money laundering. But the record in that case included evidence that shortly before the money laundering transactions were undertaken, Huezo and coconspirators Linares and Echevarria had traveled from California to Connecticut; that in Connecticut Huezo loaned his Jeep to Linares and Echevarria for a meeting with Del Rio, the supposed money launderer (in reality an undercover officer); that Huezo drove Linares, with a suitcase containing $500,000, to make a delivery to Del Rio; that two days later, "after basically helping to guard the movement of a second suitcase containing $500,000 into the Jeep," Huezo drove Linares and Echevarria with that $500,000 for delivery to Del Rio; that Huezo himself took possession of another bag of money totaling $6,000, wrapped similarly to the $1 million delivered to Del Rio; and that during this period Huezo socialized, dined, and shopped with Linares and Echevarria, and they all lived in the same house,

with the money. 546 F.3d at 182-83 (internal quotation marks omitted). We concluded that

> [b]ased on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds, to be present when Del Rio removed the first suitcase containing $500,000 from the trunk, and to share a house over several days with witting conspirators.

Id. at 182.

In the present case, in contrast, the government presented no evidence as to the nature of Torres's associations with the persons who shipped the cocaine or with the persons who expected to distribute it. There was no evidence of a sizeable payment to Torres that might reflect an expectation related to the million-dollar street value of the cocaine. There was no evidence of any conduct by Torres other than his efforts to gain possession of the Packages, which, as discussed above, did not show that he had knowledge of the Packages' contents.

Nor was there evidence that Torres was placed in a position of trust. The Packages, although addressed to him in name, could not be received by him in a location that he controlled; they were not addressed to his home (if he had a home) but rather were addressed to him at a place with which he was not shown to have any connection. Further, although UPS would not release the Packages--given their declared "high value"-- except to a person who could produce identification that he was the intended recipient, when Torres first attempted to gain

possession of the Packages with his (inadequate) ID Card, he was accompanied by another man. When Torres followed Bautista to Bautista's next destination, he was still accompanied by the other man. When Bautista and the loss-prevention agent returned to 124 Locust Hill, Torres was accompanied by three other men. And when Torres went to the UPS store to pick up the Packages, he was driven there, again with no prospects of having sole dominion over the Packages. Torres was never in a position to be alone with the Packages until the driver of the minivan fled the mall upon spotting the police surveillance. This record does not lend itself to an inference that Torres was so trusted that he must have known that he was dealing with narcotics.

In sum, we conclude that the evidence at trial, viewed as a whole and taken in the light most favorable to the government, was insufficient to permit the jury to find beyond a reasonable doubt that Torres knew that the Packages addressed to him contained narcotics, and hence was insufficient to establish that he had knowledge of the purposes of the conspiracy of which he was accused.

CONCLUSION

We have considered all of the government's arguments in support of Torres's conviction and have found them to be without merit. The judgment of the district court is reversed, and the matter is remanded for entry of a judgment of acquittal.