# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2025

(Argued: December 2, 2025     Decided: January 16, 2026)

Docket No. 24-2614

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

PAUL BELLOISI,

*Defendant-Appellant.*

Before:     SACK, ROBINSON, AND PÉREZ, *Circuit Judges.*

Defendant-Appellant PAUL BELLOISI appeals from a final judgment entered in the United States District Court for the Eastern District of New York (Irizarry, *J.*) following a jury trial convicting him of conspiracy to possess a controlled substance with intent to distribute, conspiracy to import a controlled substance, and importation of a controlled substance into the United States. Belloisi does not dispute that the government proved the existence of a conspiracy to smuggle cocaine inside the avionics

compartment of an airplane that had arrived at JFK Airport from Jamaica, nor does he dispute that the evidence was sufficient to show that he entered that compartment to retrieve *something* and likely knew his conduct was unauthorized or potentially unlawful. But he argues that the evidence was insufficient to prove that he knew he was participating in a conspiracy to import *controlled substances* as opposed to some other kind of contraband.

We agree. The government had to prove beyond a reasonable doubt that Belloisi knew that the items smuggled in the avionics compartment contained a controlled substance. Because the government did not carry that burden, we REVERSE and REMAND for entry of a judgment of acquittal. Judge Pérez dissents in a separate opinion.

――――――――

LUCAS ANDERSON, Rothman, Schneider, Soloway & Stern, LLP, New York, NY, *for Defendant-Appellant*.

ROBERT M. POLLACK, Assistant United States Attorney (Susan Corkery and Margaret Schierberl, Assistant United States Attorneys, *on the brief*), *for* Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, New York, NY, *for Appellee.*

――――――――

ROBINSON, *Circuit Judge*:

Defendant-Appellant Paul Belloisi appeals from a final judgment entered in the United States District Court for the Eastern District of New York (Irizarry, *J.*) following a jury trial, convicting him of conspiracy to possess a controlled substance with intent to distribute, conspiracy to import a controlled substance,

2

and importation of a controlled substance into the United States. Belloisi does not dispute that the government proved the existence of a conspiracy to smuggle cocaine inside the avionics compartment of an airplane that had arrived at JFK Airport from Jamaica, nor does he dispute that the evidence was sufficient to show that he entered that compartment to retrieve *something* and likely knew his conduct was unauthorized or potentially unlawful. But he argues that the evidence was insufficient to prove that he knew he was participating in a conspiracy to import *controlled substances* as opposed to some other kind of contraband.

We agree. Because the government failed to introduce evidence sufficient for a jury to find beyond a reasonable doubt that Belloisi knew the items smuggled in the avionics compartment contained a controlled substance, we REVERSE and REMAND for entry of a judgment of acquittal. Judge Pérez dissents in a separate opinion.

## BACKGROUND

When officers on the Customs and Border Protection team at JFK Airport conducted a random search of an aircraft that had just arrived from Montego Bay, Jamaica, they discovered ten brick-shaped objects hidden beneath an insulation blanket in the avionics compartment located on the underside of the plane beneath

3

the flight deck. The avionics compartment of an aircraft houses electronic equipment used for navigation, communication, autopilot and collision avoidance systems. The bricks, when unwrapped, revealed ten kilograms of packaged cocaine—a quantity with a street value over $250,000. The officers replaced the bricks with four "sham bricks," one of which contained a hidden transponder that would send a signal if moved, and they waited and watched to see who would try to access the compartment.

Belloisi, an aircraft mechanic, drove up to the aircraft in a maintenance vehicle, briefly entered and exited the jet bridge, and then opened the avionics compartment. The transponder alert sounded about twenty seconds later. As the officers approached, they saw Belloisi adjust the insulation blanket and exit the compartment. He emerged empty-handed.

When questioned that evening, Belloisi claimed that he went into the aircraft to grab chips and a soda when he noticed that the air conditioning system wasn't working. He maintained that after he tried unsuccessfully to reset the system from the cockpit, he went to the avionics compartment to fix the problem. Evidence presented at trial squarely contradicted this explanation: the pilot testified that he had been in the cockpit at the time and didn't see Belloisi or notice any issue with the air conditioning.

The government also presented evidence that Belloisi was not assigned to, or authorized to work on, the aircraft in question. Additionally, the jury saw photographs of slits cut into the lining of Belloisi's jacket and an empty tool bag found in the bed of the vehicle he drove up to the aircraft. And an expert in cell phone location data testified about Belloisi's communications with someone saved in his phone as "Lester" who drove to JFK later that night and tried to contact him repeatedly.

The jury convicted Belloisi of conspiracy to possess a controlled substance with the intent to distribute, 21 U.S.C. §§ 846 and 841(a)(1); conspiracy to import a controlled substance, 21 U.S.C. §§ 963, 952(a) and 960(a)(1); and importation of a controlled substance into the United States, 21 U.S.C. §§ 952(a) and 960(a)(1). The district court denied Belloisi's motion for a judgment of acquittal and sentenced him to 108 months in prison.

On appeal, Belloisi acknowledges that the government proved the existence of a conspiracy to smuggle cocaine inside the avionics compartment of an airplane that had arrived at JFK from Jamaica, and he does not dispute that the evidence was sufficient to show that he entered that avionics compartment "to retrieve *something*, and that he was likely aware that his conduct was unauthorized or potentially unlawful." Petitioner's Br. at 32. But he challenges the sufficiency of

the evidence to prove that he knew he was participating in a conspiracy to import *controlled substances* as opposed to some other kind of contraband.

## DISCUSSION

We review a sufficiency of the evidence challenge without deference to the district court. *United States v. Dupree*, 870 F.3d 62, 78 (2d Cir. 2017). This Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and . . . the weight of the evidence." *United States v. Rosemond*, 841 F.3d 95, 113 (2d Cir. 2016).[1] We will uphold a conviction "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010).

For all three counts of conviction, the government had to prove beyond a reasonable doubt that Belloisi knew that the items smuggled in the avionics compartment contained a controlled substance. *Id.* at 66 ("[S]ince the government cannot establish the substantive § 841(a)(1) offenses of distribution or possession with intent to distribute without proving that the defendant knew he was dealing

---

[1] In quotations from caselaw and the parties' briefing, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

with a controlled substance, it likewise cannot establish a § 846 conspiracy . . . without proving . . . that the defendant knew that the conspiracy involved a controlled substance."); 21 U.S.C. § 960(a)(1) (unlawful to "knowingly or intentionally import[] . . . a controlled substance").

The government relied, as it may, on circumstantial evidence to meet its burden at trial. *Torres*, 604 F.3d at 66 ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."). But we have cautioned that "where the Government seeks to prove a fact that is also an element of the offense by circumstantial evidence, we must be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.*

Although the government may rely on circumstantial evidence, the mere fact that Belloisi engaged in suspicious conduct in furtherance of the conspiracy is not itself sufficient to prove his knowledge. The evidence the government relies on does not show that Belloisi knew he would find controlled substances hidden in the avionics compartment. And the evidence here is insufficient to support an inference that Belloisi had the requisite knowledge based on his role in the conspiracy. We consider each of these points below.

7

## I.  Suspicious Conduct in Furtherance of Conspiracy

One thing is clear from our caselaw: the mere commission of suspicious acts that further the conspiracy does not necessarily establish a defendant's knowledge of the *nature* of the conspiracy.

For example, in *United States v. Lorenzo*, we reversed the conviction of a defendant who, at his nephew's request, transported an international drug courier to and from a hotel, paid for her lodging, and hid $14,000 in cash in her suitcase for delivery to the nephew on her return trip.  534 F.3d 153, 156–57 (2d Cir. 2008). Though there was clearly a drug trafficking conspiracy, and the defendant's conduct in furtherance of that conspiracy was "suspicious and . . . indicative of participation in illegal behavior," we concluded that the evidence did not establish that the defendant knew the courier's suitcase contained controlled substances, as opposed to other contraband.  *Id.* at 160.  Thus, the evidence was insufficient to show his "specific intent to further a cocaine smuggling and distribution conspiracy," and his conviction couldn't stand.  *Id.*

We held similarly in *United States v. Samaria*, where the defendant transported boxes that contained goods purchased with stolen credit card information and served as a lookout for the principals in the scheme.  239 F.3d 228, 232 (2d Cir. 2001).  Like Belloisi, the defendant lied to the arresting officers,

claiming he was just a cab driver who didn't know the principals and hadn't helped them before. *Id.* at 231–32. His conduct was clearly suspicious, but the evidence was insufficient to show that the defendant knew the boxes he helped transport contained stolen goods, as opposed to other contraband like "drugs, illegal weapons, [or] counterfeit currency." *Id.* at 237. We explained that false exculpatory statements "may strengthen an inference already supplied by specific indicia of knowledge and intent" but "do not, by themselves," prove that a defendant knew the nature of the conspiracy. *Id.* at 236.

And in *United States v. Rodriguez*, we reversed a defendant's drug conspiracy conviction where the government proved he served as a lookout for another person, Medina, in connection with a transaction, but it did not prove he knew the transaction involved controlled substances. 392 F.3d 539 (2d Cir. 2004). In that case, the defendant engaged in countersurveillance activity outside a restaurant just before Medina's meeting—including looking in the windows of cars in the parking lot; he sat in the restaurant at another table throughout Medina's meeting, leaving shortly after Medina departed; and he stood on a corner a block from the restaurant while Medina had a follow-up meeting with the same person in a Lincoln Town Car belonging to the defendant. *Id.* at 542–43. We concluded that the government had proven that the defendant was a lookout in connection with

9

the transaction, but it failed to present sufficient evidence to show that the defendant "knew the specific nature of the conspiracy or underlying crime." *Id.* at 548; *see also Torres*, 604 F.3d at 66 ("Proof that the defendant engaged in suspicious behavior, without proof that he had knowledge that his conduct involved narcotics, is not enough to support his conviction for conspiracy to traffic in narcotics.").

So to sustain Belloisi's conviction, we need more than evidence that there was a drug importation conspiracy and that he engaged in suspicious conduct that would potentially further that conspiracy.

## II.     The Lies, the Jacket, and the Bricks

The evidence presented by the government at trial is either inconclusive or equally consistent with Belloisi's involvement in a scheme to smuggle other contraband. For example, his false exculpatory statements fortify the inference that he knew he was participating in an unlawful conspiracy of *some sort*, but they aren't probative as to the specific object of the conspiracy. *See Samaria*, 239 F.3d at 236 (false exculpatory statements did not prove that the defendant knew the *nature* of the conspiracy).

The slits in Belloisi's jacket lining support an inference that he anticipated that at least some of the smuggled items would fit inside. That permissible

10

inference rules out bulky items such as large rifles, cultural artifacts, or paintings. But many other items would fit—for example, foreign currency, gemstones, or Cuban cigars. Just as there was insufficient evidence to prove that the defendant in *Lorenzo* knew what was *in* the suitcase carried by the international drug courier he assisted, 534 F.3d at 160, the slits in Belloisi's jacket do not non-speculatively demonstrate that Belloisi knew he was participating in a conspiracy to smuggle controlled substances.

Nor does the physical appearance of the bricks advance the government's case. According to the government, "the jury saw" photographs of what were "unmistakably bricks of narcotics, hidden but undisguised behind an insulation blanket." Gov't Br. at 24. The jury also saw the bags of cocaine extracted from the bricks.

But Belloisi saw neither. The officers removed the bricks of cocaine after taking the photographs shown at trial. There were several differences between the real bricks and the sham ones Belloisi saw. While the real bricks were covered in dark blue material, the shams were wrapped in dark green duct tape. There were only four shams, rather than the ten bricks that had been smuggled in the avionics compartment. And, as the government represented at oral argument, wires visibly protruded from the sham brick that contained the transponder. When Belloisi

11

opened the compartment, he saw these sham bricks and apparently moved the one containing the transponder, and then he closed the compartment without removing them.

Because Belloisi never saw the actual bricks, their appearance cannot support an inference that he knew he was retrieving controlled substances. Nor can the appearance of the sham bricks, which Belloisi did not take from the compartment. The parties do not dispute that Belloisi expected to see and presumably remove something not meant to be in an avionics compartment. Had he removed a sham brick designed to look like a brick of cocaine, the appearance of the removed item could well support an inference that he intended to retrieve controlled substances. But he did not. After opening the avionics compartment, Belloisi removed nothing. He left the avionics compartment empty handed. His conduct may suggest that he didn't see what he was expecting to see. But it does not support a non-speculative inference that he expected to see drugs as opposed to other contraband.

Finally, we emphasize that the government did *not* present evidence of "conversations directly related to the substance of the illegal activity, possession of documents related to the crime, exercise of authority within a conspiracy, receiving a share of the profits from the deal, or explicit confirmation of the nature

of the crime." *United States v. Cruz*, 363 F.3d 187, 199 (2d Cir. 2004) (describing evidence that would show knowledge to support aiding and abetting conviction).

### III. Belloisi's Role

The strongest potential support for the inference that Belloisi knew he was involved in a conspiracy to import *controlled substances*, as opposed to other contraband, is the inference that the leaders of the conspiracy would not entrust Belloisi with 10 kilograms of cocaine worth over $250,000 if he was not a trusted member of the conspiracy with knowledge of its aims. It's an inference we have allowed in some circumstances, and rejected in others, in a "heavily fact-specific" inquiry. *United States v. Anderson*, 747 F.3d 51, 68 (2d Cir. 2014).

In *United States v. Torres*, the defendant attempted repeatedly to collect packages that were addressed to his name at an address where he had no connection. 604 F.3d at 61–62, 69. The packages contained cabinetry in which 10 kilograms of cocaine were hidden. *Id.* at 62. The government contended that no one would trust the defendant with one million dollars' worth of cocaine if he wasn't a trusted member of the conspiracy who knew what he was receiving. *Id.* at 70.

We rejected that argument. We emphasized that there was no cooperating witness testifying at trial, no evidence of any records regarding drug distribution

13

that implicated Torres, and no proof of "any narcotics-related conversation to which Torres was a party." *Id.* at 70. We also pointed to the absence of evidence "as to the nature of Torres's associations with the persons who shipped the cocaine or with the persons who expected to distribute it," or of any payment to Torres that reflected an expectation commensurate with the value of the cocaine. *Id.* at 71. And we concluded that there was no evidence that Torres had been solely entrusted with the drugs, as he was accompanied by others until shortly before he was caught. *Id.*

By contrast, we allowed the "trusted member" inference in *Anderson*. 747 F.3d at 69. In that case, a cooperating witness who was a participant in the drug distribution conspiracy testified that the defendant met her in a parking lot in upstate New York, near the Canadian border, to pick up the drugs and drive them to New York City. *Id.* at 55–57. In assessing whether the jury could infer that he knew he would be transporting drugs, we emphasized that the defendant was traveling alone and was about to take possession of drugs worth up to $900,000 with no supervision for his journey to New York City. *Id.* at 69. "[T]he drugs would be his to do with as he wished." *Id.* We viewed this as "strong evidence of [the defendant's] trusted status in the conspiracy," and thus of his "knowledge of the contents of the bag" and the object of the conspiracy. *Id.* In addition, the

14

government produced evidence of extensive phone contacts between the defendant and individuals known to be the conspiracy's principals. *Id.* at 66, 69–70. And the cooperating witness testified that "*these* conspirators would *not* have conferred this valuable shipment of drugs to a person who was not a trusted member of the organization." *Id.* at 70.

We also permitted the inference in *United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008). There, the defendant traveled across the country with two co-conspirators in a money laundering scheme; they socialized and stayed together in the same house where the money was stashed. *Id.* at 182. The defendant drove his co-conspirators as they delivered suitcases filled with cash, and he took personal possession of a bag containing laundered funds. *Id.*

This case is closer to *Torres* than to *Anderson* and *Huezo*. First, as in *Torres*, we have no evidence of Belloisi's association with the conspiracy's principals. The government points to Belloisi's calls, texts, and meetup the night before with the unidentified co-conspirator saved in his phone as "Lester." But in contrast to *Anderson* and *Huezo*, there is no evidence here as to who "Lester" was and, in particular, whether he was a principal in the drug smuggling conspiracy.

Moreover, a jury could not non-speculatively infer that Belloisi could exercise unfettered dominion over the drugs. Here, unlike in *Anderson*, no

cooperating witness offered testimony to contextualize Belloisi's role and actions. Because the officers replaced the real bricks with sham ones and then confronted Belloisi immediately after he exited the avionics compartment empty-handed, we do not know what the next step in the smuggling scheme would have been even if Belloisi had removed a sham brick. We have no evidence as to whether Belloisi was acting unsupervised, as in *Anderson*, or whether, as in *Torres*, other members of the conspiracy were positioned to watch him as he removed the drugs from the avionics compartment and transported them to their next stop. All we know is that "Lester" was waiting for Belloisi near JFK later that night and trying to contact him, which suggests that even if Belloisi had removed drugs from the avionics compartment, he likely wouldn't have been alone with the drugs for long, if at all.

And there is no evidence that Belloisi engaged in any communications referencing controlled substances, coded or otherwise. *Cf. Torres*, 604 F.3d at 70 (noting absence of "narcotics-related conversation" to support the inference that Torres knew the nature of the contraband he sought to retrieve); *Rodriguez*, 392 F.3d at 547–48 (jury "reasonably could have concluded" that defendant spoke to principal in drug conspiracy on the phone and "discussed some aspects of the transaction," but there was no "evidence of the precise contents of the conversations"). As the dissent notes, Belloisi received a text from "Lester" saying,

16

"Confirmed!! They just confirmed to me." Dissent at 1. But that message contains no reference to narcotics and would be consistent with smuggling any contraband.

Jurors do not leave their "common sense at the courthouse door." *Anderson*, 747 F.3d at 70. Even so, their "inferences must be reasonably based on evidence presented at trial, not on speculation." *Torres*, 604 F.3d at 67. For the above reasons, Belloisi's convictions cannot stand. Because we vacate all convictions, we need not reach Belloisi's other arguments.

## CONCLUSION

For these reasons, we REVERSE and REMAND for entry of a judgment of acquittal.

MYRNA PÉREZ, *Circuit Judge*, dissenting:

On February 4, 2020, someone placed a quarter-million dollars' worth of cocaine in a compartment on the underside of a plane leaving Montego Bay, Jamaica. The plane was bound for JFK Airport. Whoever stashed the cocaine on the plane did not bother to pack it into a box or hide it in a bag. They simply taped ten bricks of cocaine to the side of the compartment, covered it with an insulation blanket, and left it to be retrieved by a co-conspirator in New York.

Several hours after the plane arrived in New York, Belloisi received a text message saying, in relevant part, "Confirmed!! They just confirmed to me." Gov't App'x at 16. Minutes later, Belloisi approached the compartment alone wearing a jacket with slits cut into its lining and an empty tool bag in his vehicle. According to the majority opinion, no rational jury could infer that, at the moment he approached the plane, Belloisi knew that he was on his way to retrieve a controlled substance. I respectfully disagree.

"[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Anderson*, 747 F.3d 51, 73 (2d Cir. 2014) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). Indeed, "[i]t is a

commonplace in drug conspiracy prosecutions that 'most evidence of intent is circumstantial.'" *Id.* at 61–62 (quoting *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010)). That is why our usual deference to the jury's verdict—which is always quite significant—is particularly important when we review a conspiracy conviction. *See id.* at 72–73.

Here, the government presented evidence that Belloisi was going to be entrusted with sole dominion over $250,000 of narcotics. On its own, this fact may not bear the whole weight of the government's case. But it is well-established that the jury can rely "on the prospect that the defendant would have 'sole dominion' over the package of narcotics as *one factor* of several that could tend to support a jury's inference of knowledge." *Id.* at 69 n.11 (emphasis added) (citing *United States v. Davis*, 690 F.3d 127 (2d Cir. 2012)). Belloisi approached the airplane alone, with slits cut in his jacket and an empty tool bag in tow in his vehicle. The majority opinion casts this evidence as speculative. *See* Maj. Op. at 15–16. I fail to see how. To be sure, Belloisi may have planned to meet a co-conspirator nearby, and soon. But he was not closely accompanied by anyone when he entered the avionics compartment, and he brought with him the means to carry the narcotics away himself. *Contra United States v. Torres*, 604 F.3d 58, 71 (2d Cir. 2010) (finding such

2

an inference inappropriate where defendant had "no prospects of having sole dominion over the Packages").

There is no dispute here that Belloisi would have had sole dominion over the contraband for some period of time. I see no reason why that fact could not support the jury's inference that he knew what that contraband was.

Moreover, whoever placed the cocaine on the plane made very little effort to conceal what it was from Belloisi. The majority opinion disregards this fact because Belloisi never saw the actual packages of cocaine, and instead only saw the sham packages. *See* Maj. Op. at 11–12. But, in my view, that misses the point. The relevant inference that a jury could draw from the appearance of the actual packages, pictured at Appellant's App'x at 842–43, is that whoever put the narcotics on the plane was comfortable with Belloisi knowing what he was smuggling the moment he looked at it. Just as entrusting a defendant with sole dominion over valuable contraband can support a relevant inference about his or her role in a conspiracy, so too does the decision to ship contraband to the defendant in a manner that assumes the defendant will discover what it is upon taking possession. *Cf. United States v. Lorenzo*, 534 F.3d 153, 155 (2d Cir. 2008) (finding insufficient evidence where contraband was contained in a suitcase);

3

*Torres*, 604 F.3d at 61 (same where contraband contained in shipping boxes); *United States v. Nusraty*, 867 F.2d 759, 760–61 (2d Cir. 1989) (same where contraband "secreted in [a] new suit").

Finally, the fact that Belloisi arrived with slits cut in his jacket and an empty tool bag suggests he had some advance knowledge about the contraband he was smuggling. The majority opinion shrugs this evidence aside because other types of contraband could fit in his jacket, not just controlled substances. *See* Maj. Op. at 11. Maybe so. But the government's case does not consist of any one fact in isolation. *See Anderson*, 747 F.3d at 59 ("When assessing a sufficiency challenge, we are mindful that we consider the evidence presented 'in its totality, not in isolation.'" (quoting *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008))). Together with the foregoing evidence, Belloisi's advance preparation supports a reasonable inference that he knew what he was retrieving from the plane.

When faced with circumstantial evidence, a juror is "entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences" from such evidence presented at trial. *See Huezo*, 546 F.3d at 182. Meanwhile, *our* task is not to second-guess the jury's "choice between the competing inferences that can be drawn from the evidence," but rather to ensure that "the jury's

4

inferences [were] 'reasonably based on evidence presented at trial,' not on speculation." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Ceballos*, 340 F.3d 115, 125 (2d Cir. 2003)). Because I believe the majority opinion exceeds our remit, I respectfully dissent.

Although I would have affirmed Belloisi's conviction, I would have vacated his sentence.[1]

When calculating Belloisi's applicable Sentencing Guidelines range, the District Court imposed a two-level enhancement for abuse of position of trust or use of a special skill under Section 3B1.3 of the Guidelines.[2] This enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S. Sent'g Guidelines Manual § 3B1.3 (U.S. Sent'g Comm'n 2023). The District Court determined that Belloisi's position as an airport mechanic qualified as a position of public and private trust, because it gave him

---

[1] The majority opinion does not reach this issue.

[2] Accordingly, the District Court calculated an offense level of 30, which resulted in a Guidelines range of 97 to 121 months' imprisonment. Without the enhancement, Belloisi's offense level would have been 28, which would have corresponded to a recommended range of 78 to 97 months. Belloisi received a sentence of 108 months in prison.

access to the highly secured JFK tarmac and enabled him to enter the airplane's avionics compartment. The Court also concluded that Belloisi's "specialized knowledge about the structure of the airplanes" allowed him to enter the avionics compartment and, later, "try to deflect attention from himself with respect to his false exculpatory statements." Appellant's App'x at 824. In my view, both of these conclusions misread the Guidelines.

"We have applied a two-pronged test to determine whether [the position-of-trust] enhancement applies: we ask '(1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense.'" *United States v. Alston*, 899 F.3d 135, 151 (2d Cir. 2018) (quoting *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016)). We need go no further than the first prong: Belloisi did not occupy a position of trust.

A position of public or private trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.1 (U.S. Sent'g Comm'n 2023). Accordingly, "[t]he enhancement applies 'only where the defendant has abused discretionary authority entrusted to [him] by the

6

victim.'" *United States v. James*, 151 F.4th 28, 45 (2d Cir. 2025) (alterations in original) (quoting *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996)). More concretely, the Guidelines distinguish between "the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination," to which the enhancement would apply, from "the case of an embezzlement or theft by an ordinary bank teller or hotel clerk," to which it would not. U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.1 (U.S. Sent'g Comm'n 2023).

The key to applying Section 3B1.3 in an employment context is the level of discretion and authority an employee wields by virtue of his or her position. The Third Circuit has laid out guidance for making this assessment: whether a defendant occupied a position of trust depends on whether he or she "had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted." *United States v. Douglas*, 885 F.3d 124, 133 (3d Cir. 2018) (en banc).

7

Adopting and applying that guidance here, Belloisi's role as an airport mechanic was not a position of trust, either from the perspective of his employer or the public. Belloisi's position only allowed him to access certain airplanes and work in certain parts of the airport. He was not permitted to be on the airplane in which the cocaine was discovered and could have faced a significant fine from his employer just for being there. Further, nothing in the record suggests that Belloisi's role allowed him to exercise discretion over the airplanes he worked on, or to do his work without supervision.

Certainly, nobody stopped Belloisi from accessing the tarmac. But the mere fact that he was able to move relatively freely throughout his workplace is not enough for the abuse-of-trust enhancement to apply. Indeed, to rule otherwise would mean that any employee who is not subject to strictly enforced movement restrictions in the workplace would occupy a position of trust. That would transform Section 3B1.3 into an enhancement that applies nearly every time a defendant commits a crime at work.[3] While the Sentencing Commission may

---

[3] The District Court also reasoned that "[t]here is a certain level of trust that's placed by the airlines and that the public has a right to rely on the mechanics that work on these airplanes. . . . [A]nd the fact that the avionics compartment of all the compartments on the plane, which has the most sensitive equipment of the plane that controls navigation, that controls all the electrical workings of an airplane, including heat, air-conditioning, air pressure, all of that sort of stuff, as was testified to, frankly put in danger the lives of almost 300 on the plane." Appellant's App'x at 824. That reasoning has strong intuitive appeal, but for purposes of Section 3B1.3, it is beside the point. The position-of-trust enhancement does not apply to

8

someday create an enhancement that reaches every workplace crime—or that covers all crimes committed by employees in particularly sensitive industries, like air travel—it has not done so in Section 3B1.3.[4]

Nor did Belloisi use a special skill "in a manner that significantly facilitated the commission or concealment" of his offenses. U.S. Sent'g Guidelines Manual § 3B1.3 (U.S. Sent'g Comm'n 2023). A special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S. Sent'g Guidelines Manual § 3B1.3 cmt. n.4 (U.S. Sent'g Comm'n 2023). Certainly, as an airport mechanic, Belloisi possessed specialized skills. But he did not use any of them to commit this crime. CBP Officer Robinson appears to have explained the *entire* process for finding, opening, and entering the avionics compartment in the span of three sentences during direct examination. *See* Appellant's App'x at 74. Nothing in the record suggests that "substantial education, training or licensing" was required to open and enter the compartment. Nor is there any indication that Belloisi needed any special skill to fabricate—in

---

crimes because they are especially dangerous—rather, whether the enhancement applies turns on the specific discretion, authority, and autonomy afforded to the role occupied by the defendant. Here, the record does not support that Belloisi exercised much discretion, authority, or autonomy at all. Thus, Section 3B1.3 does not apply.

[4]  Notably, elsewhere in the Guidelines, Section 2A5 applies to "air piracy and offenses against mass transportation systems."

the government's words—a "ludicrously false" exculpatory story for why he was inside the avionics compartment. Appellee's Br. at 22. Once again, to apply Section 3B1.3 here would be to stretch the enhancement beyond the limits the Sentencing Commission and our precedent prescribe.

For all the reasons above, I think it was improper to apply the Section 3B1.3 enhancement and I would have sent the case back to the District Court for resentencing.

\*        \*        \*

Juries, while imperfect, play an inimitable role in our justice system. This jury, presented with the sum total of the evidence, concluded that Belloisi knew and intended to retrieve controlled substances from the airplane. Perhaps, the jury may just as reasonably have declined to draw that inference. Perhaps other inferences would have been reasonable as well. That is not for us to decide. Sitting in review, all we are asked to decide is whether the conclusion the jury *did* reach had a reasonable basis in the evidence presented at trial. Because I think it did, I respectfully dissent.