Judge HALL dissents in a separate opinion.
SUSAN L. CARNEY, Circuit Judge:
Following a three-day trial in the United States District Court for the Northern District of New York, a jury found Defendant-Appellee Roohid Hakimi guilty of conspiracy and attempt to possess and distribute controlled substances — primarily those known colloquially as “ecstasy” and “foxy methoxy.”[1] Hakimi moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, challenging the sufficiency of the evidence on which the jury’s verdict rests. The district court (David N. Hurd, Judge) granted Hakimi’s motion. United States v. Hakimi, 832 F.Supp.2d 168 (N.D.N.Y.2011). The government appeals.
Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in support of the jury’s verdict, as we must, we hold that a rational trier of fact could have found the elements of the charged crimes proven beyond a reasonable doubt. In particular, the jury was entitled to infer Hakimi’s knowledge that the highly valuable bag that he was poised to receive from a co-conspirator contained illegal drugs. The *55 jury’s guilty verdict must therefore be reinstated. We reverse the district court’s judgment of acquittal, and remand for further proceedings consistent with this opinion.
BACKGROUND
The evidence presented by the government at trial consisted chiefly of testimony from law enforcement agents and from one Cheyenne Anderson — a cooperating witness, who, like Hakimi, was charged with participating in the drug conspiracy. Evidence of calls and text messages placed to and from cellular phones belonging to Hakimi and Anderson was also introduced at trial. Viewed in the light most favorable to the government, the evidence demonstrated the following.
1. The drug trafficking organization
From roughly 2008 through 2011, Cheyenne Anderson participated in a drug trafficking organization that smuggled ecstasy and other controlled substances from Canada into the United States, and cocaine from the United States into Canada. Anderson testified that, in her experience, the organization typically operated as follows: A member of the group would transport an ecstasy shipment from Montréal, Québec, to St. Regis Island in the St. Lawrence River. From there, the drugs would be ferried by boat to St. Regis (a Canadian town on the river’s southern bank), or to another nearby location, where group members would transfer the drugs from the boat into a “load vehicle.” Trial Tr. (“Tr.”) 204. A courier would drive the load vehicle south to the shipment’s destination, which, in one-half the instances Anderson knew of, was New York City. Couriers transporting ecstasy to New York City sometimes picked up cocaine and cash there for transport back into Québec. The organization also smuggled aliens across the nearby border.
Anderson’s most frequent role, which she filled on approximately nine occasions, was to act as a “blocker” or escort for a drug transporter. Tr. 201. In that capacity, her task was to drive at a distance in front of the courier who was actually transporting the shipment and alert the courier in advance to police locations and other potential problems on the way. On these occasions, an individual named Daisy Realza (who played a more important role in the group than Anderson) would call Anderson to alert her to the expected arrival of a drug shipment from Canada. Anderson, who lived on the St. Regis Mohawk Reservation near the St. Regis delivery point,[2] would then drive to meet the shipment. Once the drugs were transferred from the boat into the load vehicle, Anderson would begin driving the route. The load vehicle would leave St. Regis approximately thirty minutes after Anderson’s departure. Anderson would block as far south as Saratoga Springs, a city about 180 miles south of St. Regis and 180 miles north of New York City, and then return home.
On two occasions, when the regular driver was “too messed up on drugs,” Anderson herself drove the load vehicle to the New York City area. Tr. 208. At the start of those trips, Anderson took possession of the drugs in a single large bag that held smaller bags containing pills. Anderson was told the pills were ecstasy, and she also visually identified the pills as ecstasy.
Within the trafficking organization, Anderson’s main point of contact was Daisy Realza, mentioned above. Realza was *56 also known to Anderson as “Verna” or “Perla.” Both Realza and her boyfriend, Dallas George (Anderson’s cousin), played lead roles in the organization. Anderson did not know how many other people were involved, or who those people were, but to her knowledge, the organization may have included “[wjhoever Perla [Realza] was Mends with.” Tr. 235. As Anderson attested to at trial, however, “[T]here had to be an element of trust involved.... And if you didn’t trust a person or know the person personally, then you wouldn’t want to give them twenty pounds of ecsta-sy_” Tr. 235-36. Otherwise, Anderson agreed, that person could simply “drive off into the sunset” with the drugs, and the organization would be “out a lot of money.” Tr. 236.
2. The events of April 16,2011
On April 16, 2011, Realza contacted Anderson mid-afternoon, asking if she could help transport drugs that night. Because she did not have access to a vehicle, Anderson initially told Realza that she could not, but Anderson later decided to help, using her mother’s Chevrolet Silvera-do truck for the job. That evening, having taken the truck, she drove to the river and picked up the incoming drug shipment, which was packaged in a large blue duffel bag.
After Anderson obtained the drugs and was joined by her seventeen-year-old nephew, whom she wished to accompany her, George directed her to “meet up with this guy” at the Wal-Mart in Massena, New York, not far from St. Regis. Tr. 217. Anderson understood that the man she was to meet at the store would be taking the drugs the rest of the way to New York City. George did not tell Anderson the man’s name, but described him as “bald,” and wearing “a blue sweater with white stripes.” Tr. 218. That afternoon and evening, Anderson’s communications with Realza and George were carried out by text messages and walkie-talkie.
Also on the afternoon of April 16, a border patrol agent saw a man later identified as Hakimi driving a Chevrolet Malibu westbound, heading away from the Reservation, on a state road near Massena. As investigators later learned, the Malibu had been rented by an “Angela Woods” days earlier at Detroit Metro Airport. The agent, who was in uniform and driving a marked car, testified that Hakimi “tensed up and grabbed the wheel” as the agent passed by. Tr. 33. When the agent pulled alongside, Hakimi “started] straight ahead, [and] wouldn’t make eye contact with [the agent].” Tr. 33, 34. After the agent began following the Malibu, Hakimi made an abrupt turn, without signaling, into a parking area. The agent perceived this turn to be an evasive maneuver.
Not long after darting into the first parking lot, Hakimi drove the Malibu across the street and parked in the lot outside of the Massena Wal-Mart. According to law enforcement testimony, the Wal-Mart lot was a common spot for drug and alien smuggling activities because of the cover given by the lot’s high volume of traffic. The agent saw Hakimi leave his vehicle and enter the Wal-Mart.
Within about 15 minutes, near 5 p.m., a second border patrol agent arrived at the Wal-Mart to monitor Hakimi from an unmarked vehicle. Hakimi emerged from the Wal-Mart at around 6 p.m., walked to the Malibu, and placed a single shopping bag in the back seat. The agent observed that Hakimi had a shaved or possibly bald head, and that he was wearing a dark blue shirt with white stripes. After dropping off the shopping bag, Hakimi reentered the Wal-Mart. A third agent arrived at approximately 6:30 p.m. This agent, who was not in uniform, entered the Wal-Mart *57 to observe Hakimi. He saw Hakimi seated in a fast-food restaurant within the store, with only his cell phone on the table in front of him. Approximately two hours later, the agent reentered the Wal-Mart and saw Hakimi still seated in the same spot. The agent saw nothing to indicate that Hakimi had eaten or made any additional purchases.
Meanwhile, Anderson was on her way to the Wal-Mart. At about 8:20 p.m., she received a text from George that read, ‘We good[?]” Gov. Ex. 36. Because (as Anderson reported) George changed his phone number often, Anderson did not recognize the incoming number and responded by text, asking, “Who’s this[?]” Id. George texted, “Me d,” to which Anderson replied, “Yep good so far.”- Id. George then texted, “He[’]s got it[?]” Id. Anderson understood George to be asking whether she had completed the delivery to the man waiting at the Wal-Mart. She responded, “No I’m on my way to [Wal-Mart] now.” Tr. 154; Gov. Ex. 36. When she arrived at the Wal-Mart, Anderson parked in front of the store and walked inside. She did not see the man matching the description provided by George, but, as she was preparing to leave, Hakimi whistled to her. Hakimi was wearing a blue and white sweater, and he was “kind of bald.” Tr. 221. When Anderson pointed at Hakimi and said, ‘You,” Hakimi nodded in response, and followed Anderson out of the store. Tr. 220.
Once in the parking lot, Anderson and Hakimi entered Anderson’s truck. Anderson’s nephew had moved to the back seat, and Hakimi sat in the passenger’s seat; the large blue duffel bag holding twenty pounds of drugs lay on the floor in front of the passenger seat. Because the lot was crowded, Anderson decided she did not want to transfer the drugs there; she told Hakimi that she “didn’t want to do it at Wal-[M]art,” meaning she did not want him “to take the drugs” there. Tr. 221. Instead, she told him to follow her. Haki-mi replied, “Okay,” exited the truck, and got into his car. Tr. 222.
Anderson drove the Silverado out of the Wal-Mart parking lot and Hakimi followed in the rented Malibu. The two cars proceeded east for a short distance and then turned onto a dark and narrow side road, and continued about one-quarter mile to the road’s endpoint. One agent described the side road as “almost an alleyway.” Tr. 115.
At the dead end, Anderson turned her vehicle around and parked so that her driver’s side window was next to Hakimi’s. Both drivers “blacked out” their cars, as one agent put it, meaning they turned off their vehicle headlights. Tr. 102. Anderson exited her truck and leaned into the Malibu to speak with Hakimi. Hakimi told her that he had an address programmed into his global positioning system (“GPS”) device for his New York City destination — “[h]e knew where he was going” — but that he needed an address for his return trip to the reservation — “[h]e didn’t know how to get back.” Tr. 223. Anderson “grabbed” the device to input the additional information. Tr. 223.
Just then, one of the agents who had been following Hakimi drove towards the pair, turned on his emergency lights, and boxed in the two vehicles. As the agent stepped out of his vehicle, Anderson approached him and explained that she was “giving directions to a friend she had met in the Wal-Mart parking lot.” Tr. 104. Hakimi interjected that he “was lost” and Anderson was “helping him find his way” to a local casino. Tr. 104. When asked how long he had been in the area, Hakimi responded, untruthfully, “only ... for about an hour.” Tr. 105.
*58 The agent next used a trained dog, a member of a K-9 unit, to conduct a forensic “sniff test” of the vehicles. When the dog alerted to the presence of drugs in Anderson’s truck, agents searched the truck and recovered the blue bag from the floor of the front passenger seat, which contained four smaller bags each holding numerous pills. Beneath the back passenger seat agents also found a Ziploc bag of pills.[3] The agents took Anderson and Hakimi into custody.
Subsequent laboratory analysis disclosed that the blue bag of drugs weighed approximately 20 pounds and contained over 30,000 pills. Each of the pills was composed of some combination of ecstasy, foxy methoxy, and MDPV, all schedule I controlled substances.[4] An expert witness estimated that in New York City, the drugs’ street value was as much as $900,000.
From the car Hakimi was driving, agents recovered a GPS device, a BlackBerry, and a Wal-Mart shopping bag containing a prepaid phone card and a receipt. The BlackBerry reflected six phone calls placed by Hakimi to Dallas George during the six days leading up to the arrests, the two most recent calls having been made on the afternoon of April 15 and on the morning of April 16. Hakimi had also completed thirteen calls to a person with a number listed under the contact name “Chama,” and fifteen outgoing calls to a contact listed as “Chamaaa.” Both phone numbers began with a Québec area code. As Anderson later learned from Hakimi during a conversation connected with their court appearances, “Chamma” was the name by which the defendant referred to Realza.[5].
3. Procedural history
On September 7, 2011, the government filed a three-count superseding indictment against Hakimi and Anderson. Count One charged both defendants with conspiracy to possess with intent to distribute and to distribute a controlled substance. Count Two charged Anderson with possession with intent to distribute ecstasy, and Count Three charged Hakimi with attempt to do the same. Anderson soon pleaded guilty to both counts with which she was charged, and became a key witness for the government against Hakimi.
Hakimi’s jury trial took place from December 13-15, 2011. At the close of the government’s case, Hakimi moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), and the district court reserved decision. Hakimi elected not to offer evidence in his defense, and the case then went to the jury. After brief deliberation, the jury found Hakimi guilty as charged on both counts. The following week, the district court granted Hakimi’s motion for judgment of acquittal and dismissed the charges. United States v. Hakimi, 832 F.Supp.2d 168 (N.D.N.Y.2011).
In its written memorandum, the district court reasoned that although the govern *59 ment had presented sufficient evidence to prove the existence of a drug trafficking conspiracy, and although Hakimi’s behavior was “admittedly indicative of illegal activity,” the government had not adduced sufficient evidence from which a reasonable jury could infer Hakimi’s “knowledge and intent to participate in that conspiracy.” Id. at 173. In the district court’s view, “[e]ven accepting Anderson’s testimony as true,” no reasonable juror could conclude that Hakimi “knew Anderson had a bag of drugs in her truck or that he intended to take the drugs” from her. Id. Rather, “Hakimi’s presence at the scene [could] be attributed to innocent circumstances; to wit, his intention to be smuggled across the border into Canada” — the alternative explanation Hakimi’s counsel had offered for the defendant’s observed interactions with Anderson.[6] Id. The district court further discounted the import of the phone traffic between Hakimi on the one hand, and George and Realza, on the other, reasoning that because the final phone call between Hakimi and George occurred hours before Realza had contacted Anderson to ask for her help transporting the April 16 drug shipment, “[a] reasonable juror could ... draw no inference about the defendant’s knowledge of any plans to distribute these drugs from the phone calls.” Id. Primarily for these reasons, according to the court, the government had failed to make its case and the jury verdict could not stand. See id. at 174.
The government filed its notice of appeal the day after the court entered the judgment of acquittal.
DISCUSSION
On appeal, the government argues that the jury verdict should be reinstated, and that the district court erred in granting Hakimi’s motion for an acquittal. It maintains that, on the evidence presented, a rational jury could find — as Hakimi’s jury found — that Hakimi intended to take custody of the contraband in Anderson’s car; that he knew the contraband was illegal drugs; and that he intended to deliver the drugs to persons in New York City pursuant to an illegal conspiracy, the aims of which he was aware of and intended to further. The government contends that the jury acted rationally when it rejected the defense theory that Hakimi was “just trying to cross the border.” Def. Br. 15. For the reasons discussed below, we agree.
1. Standard of review
We review the sufficiency of the evidence de novo. United States v. Heras, 609 F.3d 101, 105 (2d Cir.2010). A defendant seeking to overturn a jury verdict on sufficiency grounds bears a “heavy burden,” United States v. Aguilar, 585 F.3d 652, 656 (2d Cir.2009), as we exercise an “exceedingly deferential standard of review,” United States v. Hassan, 578 F.3d 108, 126 (2d Cir.2008). We must “uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Aguilar, 585 F.3d at 656 (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
When assessing a sufficiency challenge, we are mindful that we consider the evidence presented “in its totality, not in isolation.” United States v. Huezo, 546 F.3d 174, 178 (2d Cir.2008). A Rule 29 motion “does not provide the trial court”— *60 or, on review, the court of appeals — “with an opportunity to substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury.” United States v. Guadagna, 183 F.3d 122, 129 (2d Cir.1999) (internal quotation marks omitted). Rather, we must view the evidence “in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.” United States v. Persico, 645 F.3d 85, 104 (2d Cir.2011) (quoting United States v. Eppolito, 543 F.3d 25, 45 (2d Cir.2008)). To sustain the jury’s verdict, the government need not disprove “every possible hypothesis” of the defendant’s innocence. United States v. Abelis, 146 F.3d 73, 80 (2d Cir.1998) (internal quotation marks omitted). And when there are “competing inferences, we must defer to the jury’s choice,” because “it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence,” Eppolito, 543 F.3d at 45 (internal quotation marks omitted).
 At the same time, “specious inferences are not indulged.” United States v. Jones, 393 F.3d 107, 111 (2d Cir.2004) (internal citations and quotation marks omitted). It “would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.” United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir.2008) (internal alterations and quotation marks omitted). Thus, “if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.” Id. (internal alterations and quotation marks omitted).
2. Conspiracy charge (Count One)
A. Legal principles
i. Conspiracy generally
The law of conspiracy is well established within our Circuit. To sustain a conspiracy conviction, “the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.” Hassan, 578 F.3d at 123 (internal quotation marks omitted).[7]
The government may prove the defendant’s knowing participation in a conspiracy through circumstantial evidence. Huezo, 546 F.3d at 180; United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir.1993). Circumstantial evidence probative of a conspiracy may include, for example, a defendant’s association with conspirators “in furtherance of the conspiracy,” United States v. Aleskerova, 300 F.3d 286, 292-93 (2d Cir.2002); his presence at “critical stages of the conspiracy that cannot be explained by happenstance,” id.; or his possession of items that are of essential significance to the conspiracy, id. In context, acts that exhibit “a consciousness of guilt, such as false exculpatory statements,” Gordon, 987 F.2d at 907, may also tend to prove knowledge and intent of a conspiracy’s purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge, United States v. Reyes, 302 F.3d 48, 56 (2d Cir.2002). Of particular import for the jury’s verdict regarding Hakimi, “a federal conviction may be supported ‘by the uncorroborated testimony’ of even a single accomplice witness ‘if that testimony is not incredible on its face and is capable of establishing guilt *61 beyond a reasonable doubt.’ ” United States v. Florez, 447 F.3d 145, 155 (2d Cir.2006) (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir.1990)).
The government need not prove the defendant’s familiarity with all of the conspiracy’s details; it may demonstrate simply the defendant’s awareness of the “general nature and extent”, of the conspiracy. Huezo, 546 F.3d at 180. It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; “it is enough,” rather, to show that “the parties ha[d] a tacit understanding to carry out the prohibited conduct.” United States v. Nusraty, 867 F.2d 759, 763 (2d Cir.1989) (internal quotation marks omitted). Indeed, a defendant may be a conspirator even if he knew only one other member of the group, and “a single act may be sufficient for an inference of [his] involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.” Huezo, 546 F.3d at 180 (internal quotation marks omitted).
We have often observed, however, that a defendant’s mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant’s criminal liability for conspiracy. United States v. Ogando, 547 F.3d 102, 107 (2d Cir.2008); Lorenzo, 534 F.3d at 159—60.
ii. Intent to commit the offenses that were the objects of the conspiracy
Critically, in order to prove conspiracy, the government must demonstrate that the defendant possessed “the specific intent to commit the offenses that were [its] objects.” Huezo, 546 F.3d at 180 (internal quotation marks omitted). This requires the government to prove “at least the degree of criminal intent necessary for the substantive offense itself.” United States v. Torres, 604 F.3d 58, 65 (2d Cir.2010) (internal quotation marks omitted).
To prove the substantive offenses underlying the conspiracy charged in this ease, the government must establish that the defendant agreed “knowingly or intentionally [to] ... possess with intent to ... distribute ... a controlled substance.” 21 U.S.C. § 841(a)(1); see also Torres, 604 F.3d at 65-66. As to intentional possession and distribution of a controlled substance, the government must, of course, prove that the defendant “knew he was dealing with a controlled substance.” Torres, 604 F.3d at 66. Therefore, to convict Hakimi of the conspiracy charged, the government was required to prove that Haki-mi knew the conspiracy involved controlled substances, and that he participated in the conspiracy with the specific intent that controlled substances be possessed by him and distributed. See id. Circumstantial evidence may be used to prove specific intent to commit the object of a conspiracy, as it may to prove agreement to join the conspiracy. See Heras, 609 F.3d at 106 (“The law has long recognized that criminal intent may be proved by circumstantial evidence alone.”).[8] It is a commonplace in drug conspiracy prosecutions that “most evidence of intent is circumstantial,” and since “conspiracies are undertakings in secret[, they] often cannot be *62 proven except through the use of circumstantial evidence.” Id. (internal quotation marks omitted).
B. Analysis
Hakimi acknowledges (as did the district court) that the record evidence was sufficient for the jury to find that on April 16, 2011, Anderson, Realza, and Dallas George were part of a drug trafficking organization that was operating in the corridor along the Hudson River from the Canadian border to the New York City area. See Hakimi, 832 F.Supp.2d at 172. The organization’s nature and standard method of operation are undisputed on appeal.
The question presented for our consideration is whether the evidence supported the jury’s determination that Haki-mi knowingly joined the organization’s conspiracy to possess and distribute a twenty-pound shipment of ecstasy.
We address that general question in two subparts. We first ask whether the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that, when Hakimi met with Anderson at the Wal-Mart parking lot, he intended to take possession of the blue duffel bag that Anderson was carrying in her truck and deliver it to points south, as opposed to achieving some other purpose. We then consider whether the evidence was sufficient to conclude that Hakimi knew the bag contained contraband of some kind, and, if so, that Hakimi knew the contraband he was poised to take control of and deliver was illegal drugs. As further explained below, if the answers to these questions are in the affirmative, we must sustain the jury’s verdict as to the conspiracy charge; if not, we must affirm the district court’s judgment of acquittal.
i. Hakimi’s intent when he met with Anderson
Anderson’s testimony makes clear that she understood George to have directed her to transfer the blue bag to Hakimi, and that she planned and was poised to make this transfer when she and Hakimi were arrested. Anderson testified that, after she picked up the bag, George told her to “meet up with” a bald man in a blue-and-white-striped sweater who would be waiting for her at the Massena Wal-Mart. Tr. 217-218. When asked at trial why she did not take the bag to New York City herself, Anderson testified that George “had found somebody else” — i.e., Hakimi — “to do it.” Tr. 218-19. She further testified that when she told Hakimi she did not want to “do it” in the Wal-Mart parking lot, she meant that she did not want Hakimi to “take the drugs” there, Tr. 221, and added that she had “no idea” as to whether Hakimi was supposed to be smuggled into Canada at some point, stating, “It wasn’t my problem after he took the drugs.” Tr. 260 (emphasis added).
Direct physical evidence recovered from Anderson’s BlackBerry corroborates her testimony. At 8:22 p.m. on the night of the arrests, Anderson received a text from George asking, ‘We good[?]” and then, “He[’]s got it[?]” Gov. Ex. 36. Anderson testified that she understood George to be asking whether she had delivered the drugs to Hakimi.
Hakimi’s own conduct, as reported by Anderson and the law enforcement officers, further supports a finding that Haki-mi intended to accept control over the blue bag and deliver it to New York City. At the Wal-Mart, Hakimi flagged Anderson, and followed her to her truck. When she told him she did not want to “do it” in the Wal-Mart parking lot, he replied only, “Okay,” Tr. 222, and trailed her out of the parking lot to the end of a dark road. *63 Hakimi did not ask why it was necessary to leave the Wal-Mart parking lot in order to transact their business together, nor did he ask Anderson what she meant by “do it”; indeed, Hakimi said and did nothing that suggests ignorance of the purpose behind their meeting or surprise at her suggestion that they go to a dark alleyway to accomplish the goal of their meeting. See Gordon, 987 F.2d at 907 (giving weight regarding the defendant’s intent to the observation that he “did not refuse to accept the drugs or profess any surprise or lack of understanding. Rather, ... [he] ‘said yes.’ ”). Furthermore, once parked at the dead end, Hakimi told Anderson he had an address programmed into his GPS for New York City — the destination of the blue bag — but that he needed an address on the reservation for his return trip.
The totality of the evidence cited above supports the inference that Hakimi, George, and Anderson were each and all aware that the purpose of Hakimi’s meeting with Anderson at Wal-Mart was for Anderson to transfer goods to Hakimi for transport to and delivery in New York City, and that Hakimi sought to carry out his role within the conspiracy. Thus, Hak-imi was more than “merely present” in the picture of a drug transaction that Anderson and the testifying officers drew; “all of the circumstances considered together show that by his presence he meant to advance the goals of [the drug] conspiracy.” Abelis, 146 F.3d at 80 (internal quotation marks omitted).
Nevertheless, the district court found that the record gave “equal or nearly equal circumstantial support to a theory of innocence; to wit, the defendant went to the Walmart in order to meet up with someone sent by [George] who was to provide him directions to a location on the Reservation from which he could sneak back into Canada illegally.” 832 F.Supp.2d at 174. In support of this theory, the district court cited Anderson’s testimony in which she acknowledged that the trafficking organization smuggled undocumented persons across the border (as well as drugs), and that the Wal-Mart parking lot “was a popular place to pick up undocumented persons.” Id. at 173.
We respectfully disagree with this proposed interpretation of the evidence. First, the district court’s theory would require us to disregard Anderson’s testimony about her purpose and plans on April 16 — testimony that we must credit in a sufficiency challenge. See, e.g., Ogando, 547 F.3d at 107 (when reviewing a sufficiency challenge, “[tjhis Court ... resolve[s] all inferences from the evidence and issues of credibility in favor of the verdict” (internal quotation marks omitted)). • As the district court implied,[9] Anderson’s testimony may not have been flawless, 832 F.Supp.2d at 174-75 n. 1, but “[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials' of [her] testimony.” United States v. Truman, 688 F.3d 129, 140 (2d Cir.2012) (internal quotation marks omitted); see also Florez, 447 F.3d at 156 (“We will not attempt to second-guess a jury’s credibility determination on a sufficiency challenge.”); United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir.1992) (“Matters of the choice between competing inferences, the credibility of the witnesses, and *64 the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury’s assessments.”).
Even were we to accept for the sake of argument that Anderson was mistaken or dissembling as to the mission George assigned her that afternoon, the district court’s theory of innocence would still be inconsistent with the record evidence. If, for example, Hakimi thought that he was at the Wal-Mart only to receive directions to a place from which he could “sneak back” into Canada, it makes little sense that he and Anderson would need to leave the parking lot to “do it,” and it is hard to imagine why he and Anderson would need to douse their headlights when meeting at the end of the cul-de-sac. Also, one must wonder why George would divert Anderson, who was carrying hundreds of thousands of dollars’ worth of illegal drugs, from the delivery trip to complete this simple task — one that conceivably could have been handled over the phone. In short, we are simply not persuaded by the district court’s assessment that the evidence provides “equal or nearly equal circumstantial support” for the speculative theory that Hakimi sought only to be smuggled north across the border when he met with Anderson. Hakimi, 832 F.Supp.2d at 174. Rather, we conclude that the jury acted rationally when it inferred from all the circumstances, and from Anderson’s testimony, that when Hakimi met with Anderson, he intended to take possession of the blue bag and deliver it to persons in the New York City area.
In support of his position that the evidence did not support his conviction, Haki-mi relies heavily on our decision in United States v. Nusraty, 867 F.2d 759 (2d Cir.1989). He argues that Anderson’s “belie[f] [that] she was supposed to deliver the drugs to the person whom she met at the Wal-Mart is not sufficient to prove that Hakimi had conspired to receive them,” Def. Br. 25, and that the additional evidence adduced does not support the conviction. We are unpersuaded. In Nusraty, we reversed for insufficient evidentiary support the drug conspiracy conviction of a taxi driver who was arrested in connection with a “controlled delivery” of drugs by a passenger at JFK Airport. The passenger arrived in the United States from travels in India, and was apprehended at Customs in possession of a suit of clothing in which packets of heroin had been secreted. The passenger advised law enforcement officers that he was unaware of the hidden heroin, and that when in India he had been directed by the cab driver’s brother (who gave him the suit for transport) to deliver the suit to Nusraty upon arrival. The passenger gave Nusraty’s name and physical description, and, scanning the airport arrival area, the agents identified Nusraty, who had parked his cab and entered the airport.
But the “controlled delivery” did not occur: the passenger did most of the talking, and Nusraty denied to the passenger that he was expecting a delivery of any suit; denied other aspects of the transaction that his brother had purportedly described to the apprehended passenger; and declined either to accept the suit or to give the passenger a ride. When arrested, “Nusraty claimed that ... it was purely a coincidence that he was in the airport when [the passenger] emerged from Customs.” 867 F.2d at 761. The passenger himself was acquitted of conspiracy. Id. at 762.
On review of Nusraty’s conviction, we held the evidence insufficient to support the jury’s verdict, characterizing the government’s case as establishing only Nusraty’s “mere presence at the scene of an aborted drug transfer” and “mere association with those implicated in an unlawful *65 undertaking.” Id. at 764. “Simply waiting for someone at an airport,” we said, was “not enough.” Id. We contrasted the case against Nusraty with cases in which there was a pattern of acts, inculpatory conversations, or possession, either actual or constructive, of the illegal drugs. And we emphasized that Nusraty actively declined to accept the drug-laden suit that the passenger pressed on him, and otherwise behaved in ways seemingly inconsistent with the passenger’s inculpatory account.
Our decision in Nusraty has served other livery drivers who had the bad fortune — coincidental or not — to pick up individuals involved in an illicit scheme and find themselves indicted for their trouble. See, e.g., Ogando, 547 F.3d 102, 104-105 (livery cab driver and drug importation); United States v. Samaria, 239 F.3d 228, 232 (2d Cir.2001) (unlicensed cab driver). But, unlike Nusraty, Hakimi was not a provider of public transportation; unlike Nusraty, he did not encounter the alleged courier in a public place, but rather followed the drug courier to a very private place (the cul-de-sac) appropriate for a secret transfer of illicit goods; unlike Nus-raty, he was shown to have been in independent contact thirty-four times with two operators of the trafficking organization, including on the day of, and the day preceding, the planned delivery; and, unlike Nusraty, he did not express surprise at or rebuff his alleged co-conspirator’s attempts to engage with him consistent with expectations of making a delivery. Cf. Gordon, 987 F.2d at 907 (distinguishing Nusraty); United States v. Oguns, 921 F.2d 442, 450 (2d Cir.1990) (same). In sum, Nusraty does not require a different result here.
ii. Inferring Hakimi’s knowledge that the bag contained illegal drugs
We next consider the evidence supporting Hakimi’s awareness that the bag he was about to receive and transport contained contraband of some kind, and, if so, that the contraband was illegal drugs. We examine this requirement most closely because, of course, the purpose of the conspiracy and the heart of the charges against Hakimi lie in the contents of the blue bag: twenty pounds of ecstasy newly arrived from Canada.
On the day of his arrest, Hakimi was driving a vehicle that had been rented hundreds of miles away under another person’s name. A uniformed law enforcement agent observed that Hakimi “tensed up” and “grabbed the wheel” upon seeing the agent on the highway. Tr. 33. Haki-mi then attempted what the agent understood to be an evasive maneuver. Once in the Wal-Mart, Hakimi spent four hours making only a single purchase and waiting with a cell phone on the table in front of him. He was monosyllabic when communicating with Anderson in public and in private, as reported by her. After following Anderson out of the parking lot and reaching the dead end, Hakimi turned off his headlights; his car was aligned driver door to driver door with Anderson’s. When a law enforcement agent interrupted the transaction and questioned the pair, Hakimi lied to the agent, telling him that he had only been in the area for an hour or so.
From this behavior, the jury could infer Hakimi’s knowledge that he was participating in an illicit activity. See Torres, 604 F.3d at 68-69 (holding that evidence was sufficient to permit inference that defendant knew packages contained contraband where his conduct was suspicious, his appearance was “nervous,” and he made false exculpatory statement to investigators); United States v. Tran, 519 F.3d 98, 105 (2d Cir.2008) (finding nervousness that “re- *66 fleeted consciousness of guilt rather than ordinary anxiety upon interacting with law enforcement” supported jury’s guilty verdict); Nusraty, 867 F.2d at 765 (explaining that defendant’s “false exculpatory statement ... offers evidence from which it could be inferred that the [defendant] ... surmised he was implicated in some sort of criminal activity”).
But this is not enough. The government was also required to show that Hakimi knew the illicit activity involved a controlled substance. See Torres, 604 F.3d at 66. The government’s proof that Hakimi knew the blue bag contained drugs consisted of Anderson’s testimony; testimony of three law enforcement officers regarding Hakimi’s behavior and the circumstances of his arrest; and evidence regarding text messages sent contemporaneously with the transaction and phone calls made by Haki-mi to principals in the drug conspiracy. In considering the significance of this evidence, we recall that intent is often established by circumstantial evidence. Heras, 609 F.3d at 106.
The jury’s finding that Hakimi was aware of the nature of the contents of the bag and thus the conspiracy’s objective rests primarily upon inferences drawn from the totality of the evidence. These inferences, which are of a type that our Court has previously and repeatedly endorsed, are as follows: First, drug dealers would be very unlikely to confide hundreds of thousands of dollars’ worth of drugs to the sole control of a person who was not a trusted member of the conspiracy. Second, a trusted member of the conspiracy may reasonably be expected to have knowledge of the nature of the conspiracy, i.e., distributing illegal drugs.
As we discuss below, the jury could infer that Hakimi was a trusted member of the conspiracy, and accordingly that he knew of the contents of the bag that Anderson plausibly testified she was about to give him. These general inferences derive decisive strength in Hakimi’s case from Anderson’s testimony that the principals in this conspiracy in particular would not have committed a valuable shipment of drugs to a person who was not a trusted individual. We turn now to examining more closely these critical components of the jury’s verdict.
a. The case law regarding the knowledge inference
In several instances, our Court has considered the inferences a jury is permitted to draw from evidence that a conspiracy entrusted a defendant with valuable contraband. For example, in United States v. Huezo, 546 F.3d 174 (2d Cir.2008), we found the evidence offered at the defendant’s trial for money-laundering and a related conspiracy charge sufficient to prove beyond a reasonable doubt the knowledge and intent elements of those crimes. The record included evidence that, shortly before the money laundering transactions were undertaken, Huezo had traveled cross-country with two co-conspirators. Then, when under surveillance, Huezo drove one of them and a suitcase containing $500,000, to make a delivery to a third (a supposed money launderer, but in reality an undercover agent); and two days later, Huezo drove the two co-conspirators and a second suitcase containing $500,000, making a second delivery to the undercover agent. Just before making the second delivery, Huezo took personal possession of another bag of money containing $6,000, packaged similarly to the $1 million that he and the others delivered in the two suitcases. During the period of these transactions, Huezo socialized, dined, and shopped with the two co-conspirators; the three occupied the same house, where the *67 money was kept before delivery to the agent. Id. at 182.
Our Court rejected the defendant’s argument that the government had failed to adduce evidence showing his knowledge of the contents of the suitcases. We held that Huezo’s conduct and his relationship with his co-conspirators were sufficient to support a reasonable inference that Huezo knew that the suitcases contained cash. Id. Pointing to the value of the delivery that Huezo was a part of, we explained:
Based on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds, to be present when [the undercover agent posing as a conspirator] removed the first suitcase containing $500,000 from the trunk, and to share a house over several days with witting conspirators.

Id.

Huezo is only one in a line of cases within this Circuit in which we have endorsed the application of such an inference. In United States v. Abelis, 146 F.3d 73 (2d Cir.1998), for example, the defendant claimed that the government had not provided sufficient evidence of the defendant’s knowledge of the purposes of an extortion conspiracy. Id. at 80. Rejecting this claim, we emphasized that “the jury was entitled to place great weight on the fact that the other conspirators trusted [defendant] to safeguard [a] $3.5 million payment that was to be made into an offshore bank account to which [defendant] was the sole signatory.” Id. at 81. Likewise, in United States v. Sisca, 503 F.2d 1337 (2d Cir.1974), we rebuffed a sufficiency challenge to a drug conspiracy conviction in the face of a defendant’s claims of ignorance, observing in relevant part, “[T]he suggestion that members of a conspiracy would entrust $60,000 in cash and a large quantity of narcotics to one who was not a full partner strains credulity.” Id. at 1343; see also United States v. Ramirez, 320 Fed.Appx. 7, 10 (2d Cir.2009) (summary order) (“[C]ommon sense and experience would support an inference that the ‘principals in [a large] conspiracy would not have trusted an outsider [ ] with no knowledge of their criminal purpose[] to transport’ hundreds of thousands of dollars in cash and drugs.” (quoting Huezo, 546 F.3d at 182) (alterations in original)); cf. United States v. Aleskerova, 300 F.3d 286, 293 (2d Cir.2002) (“A defendant’s knowing and willing participation in a conspiracy may be inferred from ... evidence that [he] possessed items important to the conspiracy.”).[10]
*68 We recognize that there must be limits to the inferences upon which the government may rely to establish a defendant’s knowledge of the object of a conspiracy. As we have noted, our opinions applying the knowledge inference of the type we affirm here are heavily fact-specific, and typically permit drawing the proposed inference in the context of numerous factors in addition to the value of the goods in question. In some circumstances, therefore, our Court has acknowledged that such an inference could be appropriate in principle, but then rejected its application because of the inadequacy of the surrounding factors demonstrating trust or expected sole dominion over the valuable goods.
Thus, for example, while acknowledging in principle the inference’s legitimacy, we held that the government’s proof in support of the inference fell short in United States v. Torres, 604 F.3d 58 (2d Cir.2010). There, our Court reversed a defendant’s conviction for conspiracy to distribute and possess with intent to distribute cocaine on the grounds that the evidence was insufficient to prove beyond a reasonable doubt that Torres acted knowingly and with the specific intent to further the conspiracy. The government’s case included evidence that ten kilograms of cocaine had been secreted in a shipment from Puerto Rico to New York; the shipment was addressed to Torres; Torres was at that address, with others, attempting to take possession of the shipment on the day in question; Torres attempted to convince a UPS driver to release the shipment to him; and Torres, again with others, went to a UPS Store to retrieve the shipment. Id. at 69.
We held that, while this evidence established the existence of a conspiracy and supported the inference that Torres intended to possess contraband, the government had not presented sufficient evidence to conclude that Torres knew the packages contained drugs. Id. at 70. We found the government’s analogy to Huezo “inapt” because, in contrast to Huezo, the government had produced inadequate evidence of the nature of the relationship between Torres and the conspiracy’s principals or of any expectation that Torres would, as part of the conspiracy, exercise sole dominion over the unidentified packages. Id. at 70-71. In this vein, the Court specifically noted that the shipment had not been sent to Torres “in a location that he controlled,” and that Torres was accompanied by others each time he attempted to take custody of the shipment. Id. at 71. Thus, we found that, at all relevant times, “Torres was never in a position to be alone with the [shipment].” Id. Therefore, the record did not “lend itself to an inference that Torres was so trusted that he must have known that he was dealing with narcotics.” Id.
In United States v. Lorenzo, 534 F.3d 153 (2d Cir.2008), we also declined to permit application of the knowledge inference endorsed in Huezo. In Lorenzo, the principal in a drug conspiracy had instructed a courier carrying a suitcase with $250,000 worth of drugs to make telephone contact with the defendant, who had been present at an earlier transaction and had delivered a package of cash to the courier on that occasion. Id. at 157, 161. During the incident that was the subject of the arrest, the courier attempted to call the defendant, but his wife answered the phone as he was asleep. She invited the courier to come to her home temporarily, which the courier did, bringing the suitcases containing drugs. Id. at 157. The defendant, now awake, was then arrested. The government argued on appeal that it could be *69 inferred that the principal “would not have entrusted [the defendant] with the suitcases concealing the narcotics ... unless [the defendant] had known what was concealed within them.” Id. at 161. In the panel’s view, however, the proposed inference, resting primarily on the “unfulfilled request for [the defendant],” was “speculative and attenuated,” having been “severely] undermine[d]” by his wife’s failure to awaken him when the courier attempted to establish contact with him. Id.
From these cases, we elicit two tenets relevant to our resolution of this aspect of Hakimi’s case. First, the fact that conspirators intended to commit highly valuable contraband to the defendant’s sole custody and control provides important evidence of a trust relationship between the defendant and other conspirators. Second, and relatedly, jurors may infer a defendant’s knowledge of the object of a conspiracy — e.g., to possess and distribute drugs — where there is evidence of such a trust relationship. The reasonableness of these inferences is, however, highly fact-dependent, and must be determined on a case-by-case basis.[11]
b. Application of the principles to the evidence against Hakimi
Applying these principles to the matter before us, we conclude that the jury could reasonably find that Hakimi enjoyed a trust position within the conspiracy such that one may infer his knowledge of the conspiracy’s goal of distributing controlled substances. The record demonstrates that the principals of the conspiracy intended to commit a highly valuable drug shipment to Hakimi’s sole custody. Indeed, the plan was that Hakimi would take control of the bag of drugs that evening, and Anderson came within moments of transferring to Hakimi 30,000 pills of ecstasy and foxy methoxy worth up to $900,000. Anderson testified that Hakimi had a New York City address in his GPS device and was prepared to drive there. No one else was traveling with Hakimi; the drugs would be his to do with as he wished.[12] This is strong evidence of Hakimi’s trusted status in the conspiracy, and his knowledge of the contents of the bag, and thus, the conspiracy’s purpose. See Huezo, 546 F.3d at 183; cf. Torres, 604 F.3d at 71.
There is, moreover, additional support in the record for finding that Hakimi was a knowing conspirator. The government produced evidence of extensive phone contacts between Hakimi and the conspiracy’s principals. As previously noted, Hakimi’s phone records revealed twenty-eight calls to Realza. Hakimi also placed six calls to *70 George in the six days prior to April 16, including one call on the morning of the planned transfer. Clearly, Hakimi, Real-za, and George were well-acquainted, and well-connected in the lead up to the crime.[13] It was hardly coincidental that Hakimi both appeared at the Wal-Mart, dressed as described by George, and acted according to the conspirators’ shared plan.
In addition, the jury heard Anderson testify on cross-examination that these conspirators would not have conferred this valuable shipment of drugs to a person who was not a trusted member of the organization:
Q. Now, were there other people in the organization outside of your family who were involved [with the conspiracy]?
A. Yes. Whoever Perla was friends with.
Q. But there had to be an element of trust involved, right?
A. Yes.
Q. And if you didn’t trust a person or know the person personally, then you wouldn’t want to give them twenty pounds of ecstasy, right?
A. No.
Q. Because they could just drive off into the sunset, and you would be out a lot of money?
A. Yes.
Tr. 235-36. Defense counsel in fact underscored this point in his summation, asking jurors, “Do you think for a minute that [the conspirators] would have just hand[ed] $900,000.00 worth of narcotics over to someone that wasn’t involved with them?” Id. at 339-40. Thus, the record contains evidence supporting application of what we have called a “common sense” inference in this case, to this conspiracy. Tr. 235-36.
We recognize that the facts adduced in Huezo regarding the nature of the relationship between the defendant and his co-conspirators were more extensive than those produced by the government here. However, although the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door: “Jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.” Huezo, 546 F.3d at 182. In our case, Hakimi had extensive contacts with the principals, flagged Anderson, followed her to a remote location, and was poised to receive hundreds of thousands of dollars’ worth of drugs. Would the conspirators have trusted Hakimi with an unsealed bag containing $900,000 worth of drugs, yet not trusted him with information about what the bag contained?
It may be possible to imagine a circumstance in which an experienced drug smuggler could decide to entrust a million-dollar package of contraband to an unwitting *71 courier.[14] There is, however, simply no evidence that the conspiracy at issue in this case ever operated in this fashion. And the theoretical possibility that it did so on April 16 does not preclude the jury from drawing the inference — in a setting that includes corroborative testimony and circumstances — that an individual who accepts sole custody of valuable contraband was a trusted member of the conspiracy, with knowledge of the contraband’s true nature. In fact, in light of Anderson’s testimony regarding the position of trust held by drug couriers within this very conspiracy, the jury would have had to disregard uncontroverted evidence to reach the conclusion that Hakimi was an uninformed agent as opposed to a trusted insider.
In contrast to Lorenzo and Torres, we find no evidence here that “severely undermines” the inference that Hakimi enjoyed a position of trust within the conspiracy or that he had not been assigned to take custody over the package. On the contrary, there is direct evidence that Hakimi was entrusted with sole possession of a valuable drug shipment, and testimony from a co-conspirator that only a trusted member of the conspiracy would be permitted to serve in such a capacity. Certainly Hakimi has directed us to no evidence that causes us to question the plausibility of the inference in this case.[15]
As additional support for rejecting the jurors’ inference of Hakimi’s knowledge and role in the conspiracy, the district court ruled that a reasonable juror could “draw no inference about the defendant’s knowledge of any plans to distribute these drugs” from the two phone calls between Hakimi and George on April 15 and 16. Hakimi, 832 F.Supp.2d at 173. Because those calls were both made “hours before [Realza] and Anderson began scrambling to find someone to transport the drugs on April 16,” the district court reasoned that “Hakimi and [George] could more easily have discussed plans to smuggle Hakimi across the border than plans to smuggle a shipment of drugs to New York City with a value of between $250,000 and $900,000.” Id. at 173. The district court erred by focusing on an inference it found more plausible instead of deferring to the inference credited by the jury. The jury reasonably may have envisioned alternative scenarios. For example, in those calls Hakimi and George could have agreed to a drug transport plan that Anderson and Realza did not know of until after Realza’s call to Anderson. Moreover, although it captured thirty-four such calls, Hakimi’s BlackBerry cannot be presumed to reflect *72 every communication between Hakimi and the principals. In this vein, Anderson testified that she was using a walkie-talkie as well as a cell phone to communicate with her supervisors, and Hakimi had purchased a prepaid phone card, suggesting that he made calls on a phone other than his BlackBerry.
Finally, we must evaluate the timing of those calls not in isolation, but as part of a body of evidence that included numerous prior calls between Hakimi and Realza; the April 16 texts highly suggestive of George’s expectation that Hakimi would be transporting the drugs (that is, “He[’]s got it[?]”); and Anderson’s testimony that her job was to deliver the drugs to Hakimi for his further transportation to New York City, see Tr. 218-19 (“Dallas had found somebody else to do it because I didn’t want to.”).[16] Reviewing the totality of the evidence, we conclude that the district court’s observation about the calls’ timing neither precludes a reasonable jury from taking those calls into account when assessing the evidence of Hakimi’s intent, nor fairly deprives their verdict of being labeled “rational.”[17]
We therefore hold that the totality of the evidence presented by the government and the inferences that may rationally be drawn from that evidence amply support the jury’s conclusion that, on the evening of April 16, Hakimi, acting as part of a conspiracy with Realza, George, and Anderson, intended to pick up from Anderson a package that he knew to contain illegal drugs, and to deliver it to others for further distribution in the New York City area.[18] We emphasize that the high degree of deference we afford to a jury verdict is “especially important when *73 reviewing a conviction of conspiracy.” United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.1992). As we have often observed, “This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon’s scalpel.” Id. (internal quotation marks omitted). Accordingly, we have commented:
It is improbable that the parties will enter into their illegal agreement openly; it is not necessary, in fact, that all the parties ever have direct contact with one another, or know one another’s identity, or even communicate verbally their intention to agree. It is therefore unlikely that the prosecution will be able to prove the formation of the agreement by direct evidence, and the jury must usually infer its existence from the clear cooperation among the parties.
Nusraty, 867 F.2d at 762 (quoting Developments in the Law — Criminal Conspiracy, 72 Harv. L.Rev. 920, 933 (1959)). This does not mean, of course, that the government can or should be relieved of its burden of proof, or a jury permitted to draw unreasonable inferences. But, to summarize, where, as here, the evidence is sufficient for a jury to find that: (1) a conspiracy existed to transport drugs from near the Canadian border to the New York City area; (2) the defendant sought to receive from one of the conspirators a package that he intended to transport as described; (3) the defendant knew the package contained illegal contraband; (4) the contraband was, in fact, a highly valuable shipment of drugs, which was to be entrusted to the defendant’s sole custody and control; (5) the defendant would only be placed in such a position if he were a trusted member of the conspiracy (according to a co-conspirator’s testimony); and (6) the defendant had placed dozens of phone calls to the principals of the conspiracy leading up to the time he was to receive and transport the shipment, a jury is then entitled to conclude that the defendant was a trusted conspirator who knew the conspiracy’s objectives and intended that they be realized.[19]
For the foregoing reasons, we reverse the decision of the district court granting Hakimi’s motion for acquittal on the conspiracy count.
3. Attempt charge (Count Three)
To prove attempt, the government must establish beyond a reasonable doubt that the defendant “(a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission.” United States v. Farhane, 634 F.3d 127, 145 (2d Cir.2011). “[F]or a defendant to *74 have taken a ‘substantial step,’ he must have engaged in more than ‘mere preparation,’ but may have stopped short of ‘the last act necessary’ for the actual commission of the substantive crime.” United States v. Celaj, 649 F.3d 162, 171 (2d Cir.2011) (quoting United States v. Yousef, 327 F.3d 56, 134 (2d Cir.2003)).
As we have discussed in connection with the conspiracy charge, the evidence was sufficient for the jury to find that Hakimi knowingly intended to possess, with an intent to distribute, the drugs at issue. Hakimi’s conduct also constituted a “substantial step” towards commission of the crime. He coordinated the transfer of drugs with the traffickers; he traveled to the pre-arranged meeting location; and he followed Anderson to a secluded spot to complete the transfer. Indeed, Hakimi did everything within his power to complete the crime of unlawful possession of a controlled substance; it was only through the intervention of law enforcement that the imminent drug transfer did not occur. Cf. Farhane, 634 F.3d at 147 (explaining that government failed to prove defendant took a “substantial step” towards possession of heroin where there was no evidence of “any act to effect possession, such as acquisition, or attempted acquisition”).
For the foregoing reasons, we reverse the decision of the district court granting Hakimi’s motion for acquittal on the attempt count.[20]
CONCLUSION
For the reasons stated above, we REVERSE the district court’s judgment of acquittal and REMAND with instructions for the entry of judgment in accordance with the jury’s verdict, and for further proceedings consistent with that verdict and this opinion.
Addendum
*75 [[Image here]]
*76 [[Image here]]

. More particularly, the superseding indictment contained two counts with regard to Hakimi: Count 1, conspiracy to possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846, and Count 3, attempted possession with the intent to distribute a controlled substance, also in violation of 21 U.S.C. § 846.

. The St. Regis Mohawk Reservation is also referred to as the Akwesasne Mohawk Reservation. It sits astride the United States-Canadian border, near Massena, New York.

. Anderson later testified that her teenaged nephew had removed the Ziploc bag from the blue duffel bag in an attempt to steal drugs.

. The laboratory report identified pills composed of some combination of 3, 4 methylene-dioxymethamphetamine ("MDMA” or “ecstasy”), 5-Methoxy-N, N-Diisopropyl-Trypta-mine (“foxy methoxy”), and 3, 4 methylene-pyrovalerone ("MDPV”). J.A. 15; Tr. 297-98, 304. For convenience, we refer to the entire shipment at issue here as "ecstasy.”

.Anderson testified that after a court appearance, she asked Hakimi whether he had "heard or called either Dallas or Perla.” Tr. 225-26. Hakimi initially said that he did not know who "Perla” was, but once Anderson described her, he acknowledged that he knew her as "Chamma.”

. Hakimi told law enforcement officers that he was a Canadian citizen. When Hakimi was apprehended, Border Patrol had no record of Hakimi crossing legally into the United States.

. In drug conspiracy prosecutions under 21 U.S.C. § 846, no overt act in furtherance of the conspiracy need be proven. United States v. Shabani, 513 U.S. 10, 15, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994).

. Intent to distribute may be inferred from the volume of drugs with which defendant was associated or that was in his actual or constructive possession. United States v. Hamilton, 978 F.2d 783, 786 (2d Cir.1992). No claim is made that the twenty pounds of ecstasy and foxy methoxy seized in connection with Hakimi and Anderson's arrest were intended for a purpose other than illegal distribution.

. While acknowledging that such credibility determinations were not appropriately part of a Rule 29 analysis, and stating that its observation "did not impact” its Rule 29(a) analysis, the district court nevertheless commented that the testimony of the Border Patrol agents was "significantly more credible than Anderson's,” 832 F.Supp.2d at 174-75 n. 1.

. Our sister circuits have also held that a jury may reasonably infer a defendant's knowledge of the true nature of a high-value drug shipment he or she is assigned to transport, on the rationale that a drug enterprise would not entrust such a shipment to a dupe. For example, in United States v. Quilca-Carpio, the Eleventh Circuit held that the evidence at trial was sufficient for a reasonable jury to conclude that a person apprehended "with luggage containing a significant amount of drugs knew of the presence of the drugs.” 118 F.3d 719, 722 (11th Cir.1997). "A reasonable jury,” the court concluded, "could infer from the quantity of drugs seized that a ‘prudent smuggler’ is not likely to entrust such valuable cargo to an innocent person without that person’s knowledge.” Id. at 722. Similarly, in United States v. Uriostegui-Estrada, the Seventh Circuit rejected a sufficiency claim in which the defendant argued that he did not know the suitcase he had agreed to transport on a stranger’s behalf contained heroin. 86 F.3d 87, 89 (7th Cir.1996). "The jury reasonably could believe that a drug smuggler would not entrust a cargo worth more than $1 million to a complete stranger who was unaware of its value,” the Court explained. Id. And ”[o]nce the jury concluded that [the defendant] had no plausi *68 ble explanation for how he innocently came to possess $ 1 million worth of heroin, it was entitled to conclude that he knew he was carrying drugs.” Id.

. Our recent decision in United States v. Davis, 690 F.3d 127 (2d Cir.2012), cert. denied, — U.S. - , 133 S.Ct. 889, 184 L.Ed.2d 691 (2013), also emphasizes the fact-dependent nature of knowledge inference analysis. In Davis, we permitted the jury to infer the defendant’s knowledge of the contents of a large package of drugs that it appeared he had shipped to himself under the guise of "[tire] rims.” Id. at 129. When arrested, he had just taken constructive possession of the package by presenting a bill of lading and directing the package's deposit into an associate’s vehicle. In Davis, we again endorsed a jury's reliance on the prospect that the defendant would have “sole dominion” over the package of narcotics as one factor of several that could tend to support a jury’s inference of knowledge.

. We note also that the blue duffel bag gave ready access to an interested party, as illustrated by the successful pilfering accomplished by Anderson’s nephew while he sat in the Silverado. Tr. 108, 224-25; see Gov. Exs. 6, 7. Unlike the sealed boxes delivered in Torres or the packages sewn into the erstwhile wedding suit in Nusraty, the packaging of the drugs that Hakimi planned to transport suggests that his co-conspirators trusted him to make the delivery, and that he knew the contents of the bag.

. Our dissenting colleague advises, "I am not persuaded that Hakimi’s post-arrest statements to Anderson suggesting that he knew Perla [Realza], phone calls of an unknown nature between Perla and him, and his few contacts with the phone number attributed to Dallas George are sufficient, without more, to support an inference that he is a trusted member of the conspiracy.” Dissenting Op. at 16-17. But the record reveals that Hakimi placed twenty-eight calls to Realza in the period leading up to his arrest, and a rational jury could certainly infer that calls made to "the phone number attributed to Dallas George,” Dissenting Op. at 17, were in fact calls made to George himself. In any event, the applicable standard is not whether our court, on review, is "persuaded” by what the testimony "suggests] rather, the standard is whether any rational trier of fact could reach this conclusion, having drawn all reasonable inferences in favor of the government. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

. The apparent use of unwitting couriers, driving their own cars and equipped with commuter passes as they regularly cross the Mexican border and park daily in predictable locations, has been documented. See, e.g., Criminal Complaint at 4-5, United States v. Chavez, No. 11-3330-G (W.D.Tex. July 1, 2011). There, the modus operandi seems to be that the principals obtain access to the car on each side of die transport, first to place, and then to retrieve, the shipment. To prove a defendant's participation in a drug conspiracy under such circumstances, the government would need a juror to infer both: (1) that the courier, in fact, knew that he was in possession of contraband; and (2) that he knew the contraband was drugs.

. The dissent contends that our majority opinion “outright ignores that principal participants in a drug conspiracy often do confide a high-value quantity of drugs to one who is not a trusted member of the conspiracy.” Dissenting Op. at 85 (emphasis in original). But, as demonstrated above, the record contains specific testimony that the principals in this case — namely, Realza and George— would not have entrusted high-value drugs to someone who was not a trusted member of the organization. In light of that testimony, what other drug conspirators may or may not "often do” does not render the jury’s verdict irrational.

. The interpretation consistent with the jury verdict derives further corroboration from Anderson's text message to Realza just before 6 p.m., "R we still goin out? ?” Gov. Ex. 36. Anderson testified that she and Realza had plans to spend the evening together; had Anderson been planning to drive to New York City and back, there would have been no such plans.

. The district court also questioned Anderson’s testimony that Hakimi entered her car when it was parked in front of the Wal-Mart (and, not incidentally, sat directly behind the blue bag of drugs). The court observed that no law enforcement officer gave corroborative testimony. 832 F.Supp.2d at 174-75 n. 1. None contradicted Anderson’s testimony, however, and it is not clear from the record that any individual officer was necessarily positioned in place or time to have observed the reported interaction. In any event, as we have discussed, Anderson’s credibility was not for the court to decide on a Rule 29 motion. ”[A]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal.” United States v. Roman, 870 F.2d 65, 71 (2d Cir.1989).

. The dissent characterizes our majority opinion as holding that the jury may infer Hakimi's knowledge that the bag contained drugs based on a " 'trust relationship,’ coupled with nothing more than the defendant’s mere presence at the site....” Dissenting Op. at 76 (emphasis added). But the inference drawn by the jury and that we uphold is based on much more, including, among other things: (1) twenty-eight calls between Hakimi and Realza within the period leading up to Hakimi’s meeting with Anderson; (2) six calls between Hakimi and George, including one call on the day of the planned delivery; and (3) testimony from a co-operating witness (Anderson) that (i) George assigned Hakimi— the man Anderson was to meet at the Wal-Mart- — -to transport the drugs; (ii) Hakimi whistled at Anderson to get her attention at the Wal-Mart; (iii) Hakimi entered Anderson's vehicle and sat in the passenger seat, with the bag of drugs at his feet; and (iv) when Anderson stated she did not want to “do it” in the Wal-Mart parking lot — which, according to her testimony, meant "for [Haki-mi] to take the drugs,” Tr. 221-22 — Hakimi answered, "Okay,” and followed her to a secluded area.

. The dissent constructs a hypothetical involving a bag full of diamonds rather than drugs in an effort to challenge our holding that a reasonable jury could infer that Hakimi had knowledge of the drugs at issue in this case. Dissenting Op. at 77-78. We note, however, that the diamond hypothetical contains certain key facts that are plainly inconsistent with the record before us. For example, in the hypothetical, the man rents a car on his own behalf, and does so only after he agrees to the smuggling scheme; in the case at bar, the car was rented several days before the events at issue, and in a different person's name in a remote city. This lends support to the inference that Hakimi was a trusted member of the conspiracy, as neither George nor Realza would have the information to trace the rental car if Hakimi chose to drive off with the drugs rather than deliver them to the intended recipient. Further, in the hypothetical, the bag was merely “in the man’s view,” Dissenting Op. at 77; here, however, Hakimi entered Anderson's vehicle and sat in the "passenger’s seat where the drugs were sitting ... on the floor.” Tr. 221-22. Police photographs showing the size and location of the duffel bag drawn from the trial record are attached to this opinion as an addendum.

. The government has also requested that we assign this matter to a different judge on remand. We decline to do so under the circumstances of this case.